**DISTRICT OF COLUMBIA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 93–601 C.

United States Court of Federal Claims.

Aug. 26, 2005.

Richard F. Gondelman, with whom was Robert J. Spagnoletti, District of Columbia Attorney General, Washington, D.C., for plaintiff.

W. Mark Nebeker, Assistant United States Attorney, with whom were David Ball, Mark E. Nagle, and Uldric L. Fiore, Jr., Assistant United States Attorneys, and Kenneth L. Wainstein, United States Attorney, Washington, D.C., for defendant.

## OPINION

BUSH, Judge.

This matter comes before the court on the parties' cross-motions for summary judgment. For the reasons set forth herein, Plaintiff's Motion for Summary Judgment on Counts I, IV and V is granted in part and denied in part. Defendant's Motion to Dismiss or for Partial Summary Judgment on Counts I and IV–VI of Plaintiff's Amended Complaint is also granted in part and denied in part.

## BACKGROUND

*Transfer of Saint Elizabeths Hospital from the Federal Government to the District of Columbia*

For over 130 years, between 1855 and September 30, 1987, Saint Elizabeths Hospital (Hospital or Saint Elizabeths) was owned and operated by the United States as an inpatient mental health facility located in the District of Columbia (District or plaintiff). On November 8, 1984, Congress enacted the Saint Elizabeths Hospital and District of Columbia Mental Health Services Act, Pub.L. No. 98–621, 98 Stat. 3369 (1984) (codified at 24 U.S.C. §§ 225–225h (2000)) (Transfer Act

or Act), which provided that the responsibility for the operations of the Hospital would be transferred from the federal government to the District on October 1, 1987. *See* 24 U.S.C. § 225b(a)(1). Congress found that allowing the District to undertake operation of the Hospital would increase efficiency and effectiveness of mental health care services and would further the goal of the District's home rule. *Id.* § 225(a)(6)-(7). Accordingly, it was Congress' desire that the District have its own mental health care system and that the District and the federal government bear equitable shares of the costs of the transition of the Hospital from the federal government to the District. *Id.* § 225(a)-(b).

The Act requires the United States to bear its equitable share of the costs of the transition of the Hospital from the federal government to the District for the overall creation of the District's comprehensive mental health system. *Id.* § 225(b). Under the Act, these costs included, but were not limited to,

> the full costs for the provision of mental health diagnostic and treatment services for the following types of patients:
>
> (A) Any individual referred to the [District's mental health] system pursuant to a Federal statute or by a responsible Federal agency; [or]
>
> (B) Any individual referred to the [District's mental health] system for emergency detention or involuntary commitment after being taken into custody (i) as a direct result of the individual's action or threat of action against a Federal official, (ii) as a direct result of the individual's action or threat of action on the grounds of the White House or of the Capitol, or (iii) under chapter 9 of Title 21 of the District of Columbia Code.

*Id.* § 225g(b)(1)-(1)(B). The above provisions applied to any individual referred to the District's mental health system before or after November 8, 1984. *Id.* § 225g(b)(1)(C). The legislative history of the Act explains that the purpose of section 225g(b)(1) is to:

> [A]uthorize[ ] the head of the appropriate federal agency to pay the District the full

costs of mental health care provided to so-called Federal mental health case individuals. These instances include any case which is referred pursuant [to] a Federal statute or by a responsible Federal agency, any case referred under chapter 9 of title 21 of the D.C.Code, any case referred as a result of an individual[']s action or threat of action against a Federal official, and any case referred as a result of a criminal proceeding in a Federal court. H.R.Rep. No. 98–1024, at 15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5810, 5825.

The Act also requires the United States, through the Department of Health and Human Services (HHS), to bear the costs to repair and renovate the Hospital to meet all applicable national and District codes and standards by October 1, 1993 for those portions of the physical plant and facility support systems of the Hospital to be utilized by the District under the final system implementation plan. *See* 24 U.S.C. § 225b(f)(2)(A). The final system implementation plan was a statutorily-mandated document that would serve as a blueprint for the creation of the District's mental health system and was to be reviewed by Congress and the District's City Council. *See* § 225b(b)-(c). Under the Act, the Mayor of the District was to prepare a preliminary system implementation plan which would be reviewed by the City Council and the Committee on the District of Columbia of the House of Representatives and the Committees on Labor and Human Resources and on Governmental Affairs of the Senate. *Id.* § 225b(b). After review and comment, the Mayor would prepare a final system implementation plan which would propose and describe the components of the District's mental health system; identify the types of treatment to be offered to patients; and, *inter alia,* identify any capital improvements to facilities at the Hospital. *Id.* § 225b(c).

To assist in the development of a system implementation plan and in preparation for the transfer of the Hospital from the federal government to the District on October 1, 1987, the Act required the Secretary of HHS to contract for a physical plant audit of all existing facilities at the Hospital. The Act required that the audit be completed by January 1, 1986 to "recognize any relevant national and District codes and estimate the useful life of existing facility support systems." *Id.* § 225b(f)(1). The Secretary of HHS contracted with AEPA Architects/Engineers of Washington, D.C. (AEPA) to conduct the physical plant audit. The AEPA audit was completed in late 1985 and submitted to Congress in January, 1986.

After the completion of the AEPA audit, the District submitted its final system implementation plan to Congress. In its final system implementation plan, the District proposed to take ownership of the majority of the East Campus of the Hospital. The District also proposed to take over five buildings on the West Campus.

The Act required the Secretary of HHS to repair and renovate the physical plant and facility support systems of the Hospital pursuant to the physical plant audit. *See* 24 U.S.C. § 225b(f)(2)(A). The Secretary of HHS was required to initiate these repairs and renovations no later than October 1, 1987, and complete them no later than October 1, 1991. 24 U.S.C. § 225b(f)(2)(A) (1988). Via legislative amendment to the Act, the deadline was extended and HHS was permitted until October 1, 1993 to complete the repairs. Pub.L. No. 102–150, 105 Stat. 980 (1991) (now codified at 24 U.S.C. § 225b(f)(2)(A) (2000)). This amendment to the Act also permitted HHS an alternative to performing the repairs; HHS could provide funds to the District and have the District complete the necessary repairs and renovations itself. 24 U.S.C. § 225b(f)(2)(C). All other facilities and the infrastructure of the Hospital "not assumed by the District" were to be maintained by the Secretary of HHS in the condition described in the AEPA report, at least until October 1, 1987. *Id.* § 225b(f)(2)(B).

In its final system implementation plan, the District also proposed to use buildings located on the West Campus on a temporary basis. Accordingly, the District and HHS negotiated and entered into a Use Permit which permitted the District to occupy the non-transferred buildings on the West Campus during the transition period from Octo-

ber 1, 1987 through September 30, 1991 (Use Permit). By deed dated September 30, 1987, HHS transferred to the District the portions of the Hospital campus identified therein. The District occupied the West Campus under the Use Permit during the specified term.

In January of 1986, HHS submitted to Congress its appropriation request for fiscal year 1988. Included in its appropriation request was a request for funds that HHS projected would be needed to carry out its responsibilities under the Act to complete repairs and renovations of the Hospital. After HHS submitted its fiscal year 1988 appropriation request to Congress, the District expressed its view that the amount requested by HHS would be insufficient, and that more funds would be needed to bring the Hospital campus up to standards. HHS disagreed with the District, and advanced the view that the appropriation request, together with other amounts requested, would be sufficient to carry out the requirements of the Act.

On December 22, 1987, Congress passed Pub.L. No. 100–202, 101 Stat. 1329–91, and 1329–267 (1987), including two federal appropriation provisions to carry out the purposes of the Act. The first was a payment of $29 million to the District of Columbia pursuant to the Act, while the second was a subsidy appropriating $62,793,000 to carry out various provisions of the Act for the year 1988. Funds from the second appropriation were to be used for sections 4, 6 and 9 of the Act, as codified at 24 U.S.C. §§ 225, 225b, and 225g.[1] The second appropriation also authorized transfer to the District of any unobligated balances from the Hospital's construction and renovation account, apart from the balance determined by HHS to be necessary to carry out existing renovation contracts. *See* Pub.L. No. 100–202, 101 Stat. at 1329–267. According to defendant, the unobligated construction balance of $3,826,438.86 in the Hospital's construction and renovation account was transferred to and accepted by the District on February 4, 1988. Def.'s App. at 7, ¶ 16 (Pittman Decl.). On April 14, 1988, HHS transferred $27,618,445.48 to the District. *Id.* Defendant claims that

> [t]his represented total payments of $62,185,911.10, of which $26,751,000 was for repair and renovation costs and $1,186,000 was for preservation and protection of the residual federal property on the St. Elizabeths campus. However, because an offset of $34,567,465.62 (representing money owed by the District to the U.S. Treasury for services provided by the federal government at St. Elizabeths) was applied to the transfer, the amount of funds actually transferred on April 14, 1988 was $27,618,445.48.

*Id.* at 7–8, ¶ 16.

*The Claims*

On September 30, 1993, the District filed a multi-count complaint against the United States. The complaint was amended twice, once on November 3, 1995 and again on December 12, 2003. In its six-count complaint, as amended, the District contends that various federal agencies, including the United States Secret Service (Secret Service), the Department of Veterans Affairs (VA), the Department of Labor, and the United States Marshals Service (Marshals Service), failed to pay the District for the full costs of mental health care and treatment provided to individuals referred to the Hospital under 24 U.S.C. § 225g. The complaint also alleges that HHS failed to provide the District with the funds to make repairs and renovations to the Hospital campus under 24 U.S.C. § 225b(f)(2), and that HHS failed to transfer all of the allotted monies under the Use Permit. On April 9, 1999, Count VI was settled as to all allegations against the Marshals Service except for plaintiff's claim for prejudgment interest. Count VI had alleged that the government failed to pay the District the full costs for the provision of mental health diagnostic services for persons referred to the District's mental health system under 24 U.S.C. § 225g(b)(1)(C) by the Marshals Service in the amount of $2,794,358.08.

---

1. The second appropriation also gave the District $2,609,000 for 1989 to be used pursuant to 24 U.S.C. §§ 225d and 225g.

On December 20, 2002, plaintiff filed its motion for summary judgment on Counts I, IV and V. Counts II and III of the complaint were settled by the parties at about this time and were dismissed on January 3, 2003. Count II involved allegations that the VA referred at least seventy-three patients to the District's mental health system for diagnostic and treatment services. Plaintiff sought reimbursement of $455,943.73 for mental health services provided to patients referred before and after October 1, 1987 by the VA for the period up to July 31, 1993 under 24 U.S.C. § 225g(b). Count III involved allegations that the Department of Labor referred at least one patient to the District for diagnostic and treatment services. Plaintiff sought reimbursement in the amount of $310,345.96 for mental health services for patients referred by the Department of Labor through May 31, 1995 under 24 U.S.C. § 225g(b).

On June 12, 2003, defendant filed its motion to dismiss or for partial summary judgment on Counts I and IV–VI of plaintiff's amended complaint, which included its opposition to plaintiff's motion for summary judgment. Plaintiff filed its opposition to defendant's motion to dismiss or for partial summary judgment and its reply to defendant's opposition to plaintiff's motion for summary judgment on September 9, 2003. Defendant filed its reply to plaintiff's opposition to defendant's motion to dismiss or for partial summary judgment on November 6, 2003 and plaintiff filed a sur-reply on December 8, 2003. Plaintiff's December 20, 2002 motion for summary judgment and defendant's June 12, 2003 motion to dismiss or for partial summary judgment are the pending motions being considered by this court in this opinion.

Plaintiff's remaining claims are described as follows: In Count I, plaintiff claims that the Act requires the appropriate federal agency, beginning on October 1, 1987, to pay the District the full costs for the provision of mental health diagnostic and treatment services for certain categories of patients. These patients include, *inter alia,* (a) any individual referred to the District's mental health system pursuant to a federal statute or by a responsible federal agency; or (b) any individual referred to the District's mental health system for emergency detention or involuntary commitment after being taken into custody (i) as a *direct result of the individual's action or threat of action against a federal official, or (ii) as a direct result of the individual's action or threat of action on the grounds of the White House or of the Capitol.* See 24 U.S.C. § 225g(b)(1). According to plaintiff, the United States, through its agency the Secret Service, is financially responsible for the mental health and diagnostic and treatment services provided to at least 355 individuals who were provided mental health services by the District between October 1, 1987 and August 22, 2002. Plaintiff claims that the total cost of mental health diagnostic and treatment services owed for the 355 individuals is $11,010,262.51, plus any interest due. Compl. ¶ 12.

With respect to Count IV, plaintiff claims that, pursuant to 24 U.S.C. § 225b(f)(1), the United States, through its agency HHS, was required to conduct a financial and physical plant audit of all existing facilities at the Hospital by January 1, 1986. The physical plant audit was required to recognize any relevant national and District code violations and to estimate the useful life of existing facility support systems. 24 U.S.C. § 225b(f)(1). Defendant was required to initiate, no later than October 1, 1987 and complete no later than October 1, 1993, such repairs and renovations to the physical plant and facility support systems of the Hospital to be utilized by the District under the system implementation plan as part of the District's comprehensive mental health system. *Id.* § 225b(f)(2)(A). According to plaintiff's motion, the estimated cost of repairing and renovating the buildings identified in the final system implementation plan was $32,980,624. Pl.'s Mot. at 17. Plaintiff now claims that defendant failed to complete or pay for the necessary repairs and renovations indicated in the audit, including, but not limited to, the power plant and steam distribution system, in violation of the Act in the amount of $12,305,624. *Id.* Plaintiff also claims an additional unpaid balance for asbestos removal of at least $2,028,000, *id.* at 28, and that defendant failed to provide for

an escalation of costs through November 2002, *id.* at 17, for a total claim under Count IV of $21,187,856.58, *id.* at i.

With respect to Count V, plaintiff claims that as of October 1, 1987, defendant continued to hold title to most of the buildings and grounds on the West Campus. On September 30, 1987, HHS and plaintiff executed the Use Permit under which HHS allegedly granted permission to plaintiff to use and occupy most of the West Campus. The term of the Use Permit was from October 1, 1987 through September 30, 1991. According to plaintiff, under section 13 of the Use Permit, plaintiff agreed to be responsible for the preservation, maintenance and repair of any buildings on the West Campus not occupied or operated by plaintiff, and defendant agreed to reimburse plaintiff for the actual cost of such preservation, maintenance and repair up to $1,386,000. Plaintiff claims that HHS provided only $1,186,000 to the District, and is thus liable to plaintiff in the amount of $200,000.

With respect to the remaining claim for interest in Count VI, it appears that plaintiff continues to seek prejudgment interest on this count, although the parties settled other aspects of Count VI claims and filed a stipulation of partial dismissal of Count VI on April 12, 1999.

## DISCUSSION

### I. Standard of Review

This matter is before the court on defendant's motion to dismiss or for partial summary judgment on Counts I and IV–VI of plaintiff's amended complaint and plaintiff's motion for summary judgment on Counts I, IV and V.

Because defendant's motion is one to dismiss the complaint under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC) for failure to state a claim upon which relief can be granted, or, in the alternative, for summary judgment under RCFC 56, the court must first address the standard of review for defendant's motion. RCFC 12(b) provides that "[i]f, on a motion ... to dismiss for failure of the pleading to state a claim upon which relief can be grant-

ed, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56." RCFC 12(b). Both parties have referred to extra-pleading materials in support of their respective positions. Once the court decides to accept extra-pleading material, it must convert the 12(b)(6) motion into a Rule 56 motion. *De Brousse v. United States,* 28 Fed.Cl. 187, 188 (1993) (treating a motion to dismiss as a motion for summary judgment because matters outside of the pleadings were not excluded by the court); *Schultz v. United States,* 5 Cl.Ct. 412, 416 (1984) (stating that the court was required to treat a motion for judgment on the pleadings as a motion for summary judgment because the plaintiff presented matters outside the pleadings).

RCFC 12(b) provides that when an RCFC 12(b)(6) motion is converted into an RCFC 56 motion, the parties "shall be given a reasonable opportunity to present all material made pertinent to such a motion by RCFC 56." RCFC 12(b); *see Thoen v. United States,* 765 F.2d 1110, 1114 (Fed.Cir.1985) ("Cases from this and other courts underscore the importance of the opportunity for the opposing party to counter a summary judgment motion."). In this instance, because defendant moved in the alternative for summary judgment, plaintiff has had ample time to submit materials and arguments opposing summary judgment. This is evidenced most clearly by the exhibits submitted by plaintiff with its original motion for summary judgment and its opposition briefs. Accordingly, because the court has considered the extra-pleading materials submitted by the parties and because plaintiff has had ample opportunity to present all materials and arguments in support of its position against defendant's motion for summary judgment, defendant's motion to dismiss will be treated as a motion for summary judgment under RCFC 56. *See* RCFC 12(b).

The moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). Defendant, as the moving party on its motion, has the burden of establishing the absence of disputed genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When opposing defendant's motion, plaintiff has the burden of providing sufficient evidence to show that a genuine issue of material fact indeed exists. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. Any evidence presented by the nonmovant is to be believed and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Summary judgment pursuant to RCFC 56 properly can intercede and prevent trial if the movant has demonstrated that trial would be useless because more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir. 1984).

The court addresses the issues and burdens surrounding pending cross-motions for summary judgment. Separate motions for summary judgment from each party are not an admission that no material facts remain at issue. *See Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997) (citing *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir.1978)). Rather, as in this case, the separate summary judgment motions of each party may focus on different legal principles and allege as undisputed a different set of facts. *Id.*

Defendant requests that this court rule in favor of its motion for summary judgment on the basis that no genuine issues of material fact exist and as a matter of law, plaintiff is not entitled to the relief it seeks. Plaintiff is

afforded, in opposing defendant's motion, a favorable view of the facts presented by the parties. The inquiry on defendant's motion for summary judgment is whether, on the facts presented, defendant has discharged its burden of showing that it is entitled to judgment as a matter of law.[2]

With respect to plaintiff's motion for summary judgment, plaintiff is held to the same standard. As the movant, plaintiff must show its entitlement to judgment as a matter of law after demonstrating an absence of any genuine disputes over material facts. *Id.* (stating that on cross-motions for summary judgment, "[e]ach party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts"); *Bayou Land & Marine Contractors, Inc. v. United States*, 23 Cl.Ct. 764, 768 (1991) ("Both plaintiff and defendant, as the moving parties, have the burden of establishing that there are no genuine material issues in dispute and that the movant is entitled to judgment as a matter of law.") (citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548). As the nonmovant with respect to plaintiff's motion, defendant has the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Bayou Land*, 23 Cl.Ct. at 768 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

## II. Analysis

### A. Jurisdictional Inquiry

Before reaching the substantive questions presented by this case, the court must first address its jurisdiction over plaintiff's claims. This inquiry is regrettably complex. Although all of the four remaining counts of the complaint are similar in that each states a request for a sum certain in money damages, they are also dissimilar in that they are founded on distinct theories of recovery and different aspects of the Transfer Act. Therefore, each count will be the focus of a separate discussion of this court's jurisdiction over the type of claim at issue in that count.

---

**2.** *Defendant also challenges the court's subject matter jurisdiction to entertain this matter under* RCFC 12(b)(1). The court addresses this argument in Section II.A., *infra.*

The court begins, however, with a more general review of this court's jurisdiction and the analysis it must undertake to exercise jurisdiction over these claims.

Plaintiff bears the burden of establishing subject matter jurisdiction, *see Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998) (*citing McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)), and must do so by a preponderance of the evidence, *see Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). The court may look beyond the pleadings in order to determine jurisdiction. *Martinez v. United States*, 48 Fed.Cl. 851, 857 (2001) (citing *Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir.1991)). As stated in *Martinez*, "[i]ndeed, the court may, and often must, find facts on its own." 48 Fed.Cl. at 857.

This court's jurisdiction is based on the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000). Pursuant to this statute, this court has

> jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

*Id.* The Tucker Act functions as a jurisdictional statute, but plaintiffs in this court must, in addition, found their substantive right to bring an action on a specific source of law. *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The United States Supreme Court decided that this court may generally entertain a suit only if it is founded upon a claim for money allegedly due to the plaintiff from the government. *Id.* at 397–98, 96 S.Ct. 948; *see also Kanemoto v. Reno*, 41 F.3d 641, 644–45 (Fed.Cir.1994) (noting that, with limited exceptions, only monetary relief is available from this court).

Pertinent to the case at bar, the Supreme Court has recognized that not all statutes which provide an economic benefit are compensation mandating. *See Bowen v. Massachusetts*, 487 U.S. 879, 905 n. 42, 108 S.Ct.

2722, 101 L.Ed.2d 749 (1988). In *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), the Supreme Court explained that a claimant must demonstrate that the source of substantive law relied upon " ' "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." ' " *Id.* at 217, 103 S.Ct. 2961 (quoting *Testan*, 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002, 1009 (1967) (*Eastport Steamship*))). The Supreme Court has further explained that:

> This "fair interpretation" rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity.... It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be "lightly inferred," a fair inference will do.

*United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472–73, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (citation omitted).

The Federal Circuit explained and reframed this jurisdictional inquiry in its recent decision in *Fisher v. United States*, 402 F.3d 1167 (Fed.Cir.2005) (portion decided *en banc*). In *Fisher*, the Federal Circuit overruled *Gollehon Farming v. United States*, 207 F.3d 1373 (Fed.Cir.2000), which had described a two-step jurisdictional inquiry for determining whether a source of law, such as a statute or regulation, is money-mandating. *Fisher*, 402 F.3d at 1173. Under *Gollehon*, in order to satisfy the jurisdictional requirement that a money-mandating statute or regulation is before this court, first, the plaintiff was only required to make a non-frivolous allegation that the statute or regulation could be interpreted as money-mandating. 207 F.3d at 1379. The non-frivolous allegation satisfied the jurisdictional requirement. *Id.* If, as a second step, the issue of jurisdiction was later pressed and it was subsequently decided that the statute or regulation was not money-mandating, then the case would be dismissed for failure to state a claim upon which relief can be granted. *Id.*

■ The Federal Circuit departed from this two-step inquiry and opted for a one-

step inquiry. This inquiry requires the court to determine at the outset whether, in response to a motion by the government, or *sua sponte*, the constitutional provision, statute, or regulation, *see* 28 U.S.C. § 1491(a)(1), is one that is money-mandating. *Fisher*, 402 F.3d at 1173. If the court's conclusion is that the source of law meets the money-mandating test, the court shall declare that it has jurisdiction over the cause, and shall then proceed with the case. *Id.* The inquiry "shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action." *Id.* The Federal Circuit further determined that if the source as alleged and pled is not money-mandating, the court shall dismiss the cause for lack of jurisdiction under RCFC 12(b)(1). *Id.* If a source is found instead to be money-mandating, but the plaintiff fails to meet the requirements that the money-mandating statute requires, or the plaintiff's claim does not fit within the scope of the source statute, the plaintiff loses on the merits for failing to state a claim on which relief can be granted. *Id.* at 1175–76.

▮ Thus, the jurisdictional question in this case is whether the Transfer Act can be fairly interpreted as mandating compensation. A statute is money-mandating if the statute " 'grants the claimant, expressly or by implication, a right to be paid a certain sum.' " *Ont. Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed.Cir.2004) (quoting *Eastport Steamship*, 372 F.2d at 1007, and citing *Testan*, 424 U.S. at 401–02, 96 S.Ct. 948). This inquiry is different for each count of the complaint because the Transfer Act might mandate compensation under some of its provisions, but not under others. Following the guidance of *Fisher*, the court must, at the outset, determine whether the Transfer Act confers subject matter jurisdiction on this court for these counts before addressing whether the facts of this case could support granting the relief requested in the complaint.

### 1. Subject Matter Jurisdiction Over Count I [3]

Count I, in particular, presents a novel jurisdictional issue related to the unique nature of the Transfer Act. The United States has committed to providing funding to the District for the treatment of certain types of mental health patients for whom the federal government accepts fiscal responsibility, based on the unique situation of the District in its roles as host to the federal government and as the transferee of Saint Elizabeths. 24 U.S.C. § 225g(b)(1)(A)-(C). Defendant argues that this court lacks subject matter jurisdiction over Count I of plaintiff's lawsuit because the Act is not a compensation-mandating statute for the mental health care needs of the particular types of patients described in the statute. Def.'s Reply at 1–6. Plaintiff disagrees, arguing that this court has jurisdiction under the Tucker Act because the Transfer Act "requires defendant to compensate the District for the services it has already provided to those specific individuals who Congress has expressly deemed a federal financial responsibility." Pl.'s Sur-Reply at 2.

▮ The *Fisher* court acknowledged that the Supreme Court has applied for decades what is known as the *Mitchell* test for determining whether a statute is a money-mandating source. 402 F.3d at 1173. The Supreme Court in *Mitchell* established that a statute is money-mandating for jurisdictional purposes if it "can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [it] impose[s]." *Mitchell*, 463 U.S. at 219, 103 S.Ct. 2961; *see also White Mountain Apache Tribe*, 537 U.S. at 472–73, 123 S.Ct. 1126. Because this court appears to be the first to decide whether the Transfer Act is a money-mandating statute, the court begins its analysis with the language of the statute itself. *See Flowers v. Sec'y of Dep't of Health and Human Servs.*, 49 F.3d 1558, 1560 (Fed.Cir. 1995) (stating that "statutory interpretation begins with the language of the statute itself, which must ordinarily be regarded as conclu-

---

**3.** The jurisdictional analysis here is also applicable to the Count VI claims for reimbursement for mental health services for patients referred by the Marshals Service, even though the only re-

maining portion of those claims is plaintiff's claim for prejudgment interest on the amount that was paid in partial settlement of the claims in Count VI of the complaint.

sive absent a clearly expressed legislative intent to the contrary") (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)).

■ The plain language of the Transfer Act clearly mandates payment by the United States to the District for the mental health services for certain types of patients. 24 U.S.C. § 225g(b)(1) (stating that "the appropriate Federal agency *is directed to pay the District of Columbia the full costs* for the provision of mental health diagnostic and treatment services for the following types of patients") (emphasis added). When a statute states that the United States "shall pay" compensation for a rendered service, such a statute is generally found to be money-mandating. *Agwiak v. United States,* 347 F.3d 1375, 1380 (Fed.Cir.2003) ("We have repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating.") (citing *McBryde v. United States,* 299 F.3d 1357, 1361 (Fed.Cir.2002); *Huston v. United States,* 956 F.2d 259, 261–62 (Fed. Cir.1992); *Grav v. United States,* 886 F.2d 1305, 1307 (Fed.Cir.1989)). Even statutory language such as "may award and pay" has been found to be money-mandating, when the legislative intent and context of the statute indicate that the applicant is entitled to payment from the United States if certain conditions have been met. *See Doe v. United States,* 100 F.3d 1576, 1580–82 (Fed.Cir.1996) (finding an informant payment statute, 19 U.S.C. § 1619 (1994), to be money-mandating for purposes of subject matter jurisdiction in this court). The Transfer Act language, "[the United States] is directed to pay the District of Columbia the full costs for the provision of mental health diagnostic and treatment services for the following types of patients," is an unambiguous mandate for compensation and fits well within the definition of a money-mandating statutory provision given in *Eastport Steamship*: a "specific provision of law [that] embodies a command

to the United States to pay the plaintiff some money, upon proof of conditions which he is said to meet." 372 F.2d at 1008. Thus, under the *Mitchell* test, Tucker Act jurisdiction lies for Count I of the complaint.

Nevertheless, Defendant launches a full-scale assault on this court's jurisdiction over Count I in its reply brief,[4] relying principally on *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). *Bowen* has engendered extensive commentary within the Federal Circuit and elsewhere as courts and other authorities have grappled with its holding concerning the jurisdiction of federal courts over suits where the United States is one of the party defendants. *See* Gregory C. Sisk, *The Tapestry Unravels: Statutory Waivers of Sovereign Immunity and Money Claims Against the United States,* 71 Geo. Wash. L.Rev. 602, 619 (2003). The *Bowen* line of authority is best understood by reviewing a number of decisions which are controlling precedent for this court, including *Bowen,* of course, which contrast two waivers of sovereign immunity. The first is found in the Tucker Act,[5] 28 U.S.C. § 1491(a)(1) (2000), the foundation of this court's jurisdiction, and the second is found in the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (2000) (APA), which gives United States district courts jurisdiction over certain claims "seeking relief other than money damages" against the United States, *id.* § 702. When the holding in *Bowen* is applied to this case, jurisdiction lies squarely in this court for the District's claims in Count I.

a. **The *Bowen* Court Finds Jurisdiction Over Certain Monetary Claims To Lie in the United States District Courts Under the APA**

*Chula IV*

The court begins its discussion with a pre-*Bowen* jurisdictional decision by the Federal

---

4. Defendant's only allusion to this court's jurisdiction over Count I in its opening brief is in a one-sentence footnote concerning a jurisdictional aspect of the relief sought by the District and citing *Bowen,* 487 U.S. at 895, 108 S.Ct. 2722. Def.'s Mot. at 28 n. 19.

5. Although the court refers to the Tucker Act in the singular, there are three Tucker Acts providing waivers of sovereign immunity: "the (Big) Tucker Act, 28 U.S.C. § 1491; the Little Tucker Act, 28 U.S.C. § 1346(a)(2); and the Indian Tucker Act, 28 U.S.C. § 1505." *Fisher,* 402 F.3d at 1172 n. 4. The court's discussion primarily concerns section 1491.

Circuit. In *Chula Vista City School District v. Bennett,* 824 F.2d 1573 (Fed.Cir.1987) (*Chula IV*), plaintiff school districts began their litigation in the United States District Court for the Southern District of California. The school districts sought injunctive and declaratory relief for review of their FY 1979 applications for federal funding under the Impact Aid program, 20 U.S.C. §§ 236–244, using a particular set of criteria. *Id.* at 1577–78. The controversy centered on whether these plaintiffs had the right under the statute to have their applications reviewed under an experimental grading system used by the Department of Education for a brief, three-month period, a system which produced higher grant awards for some school districts, rather than under the long-standing grading system which tended to keep awards at a lower level. *Id.* The plaintiffs sought administrative resolution of the controversy, but were not successful in obtaining review of their grant applications under the more generous grading system. *Id.* at 1578.

In the district court, plaintiffs won a judgment declaring that their amended applications should be reviewed under the experimental criteria system that was likely to bring greater grant amounts to each district, even though that system had been quickly abandoned by the Department of Education. *Id.* When an appeal of the judgment for plaintiffs in that case, originally filed in the Ninth Circuit, was transferred to the Federal Circuit by order of the United States Supreme Court, *Chula Vista City Sch. Dist. v. Bennett,* 474 U.S. 1098, 106 S.Ct. 876, 88 L.Ed.2d 913 (1986) (*Chula III*), the Federal Circuit decided that plaintiffs' pleas for relief were in essence monetary claims against the United States based on statutory rights, *Chula IV,* 824 F.2d at 1579. The Federal Circuit ordered the dismissal of the claims of forty-nine of the fifty-five school district plaintiffs because the district court lacked jurisdiction for monetary claims against the United States for more than $10,000 and the great majority of the school districts sought sums in excess of that amount. *Id.* As the Federal Circuit noted, under the Tucker Act, exclusive jurisdiction for monetary claims against the United States for more than $10,000 is vested in the Claims Court (now the United States Court of Federal Claims). *Id.* at 1578–79. It is not clear whether APA jurisdiction over the claims was argued by the parties in *Chula IV.* In any case, because of the exclusive grant of jurisdiction to this court for monetary claims against the United States amounting to more than $10,000, the district court was found to not have jurisdiction over those claims.

*Bowen*

Less than a year later, the United States Supreme Court issued *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), which yielded a different result—a district court, not the Claims Court, was in certain circumstances the only appropriate forum for monetary claims against the United States for more than $10,000 based on rights embodied in a federal statute. *Bowen* confronted the question of whether a dispute over Medicaid reimbursement to a state should be brought in a United States district court or the Claims Court (now the Court of Federal Claims). *Id.* at 882, 108 S.Ct. 2722. After a thorough analysis of the particular nature of the relief sought by the Commonwealth of Massachusetts (State) regarding the disallowance of certain expenditures in the State's Medicaid program, the Supreme Court held that the APA created a waiver of sovereign immunity for this type of claim, and that the action was properly before the United States District Court for the District of Massachusetts. *Id.* at 891–908, 108 S.Ct. 2722. The Supreme Court also stated that jurisdiction was "doubtful" in the Claims Court for the type of Medicaid disallowance dispute presented by *Bowen. Id.* at 905, 108 S.Ct. 2722.

For the court's present purposes, it is perhaps most useful to discuss the holding in *Bowen* by separating the Supreme Court's commentary on the jurisdictional issue into two themes: the reasons why the dispute in that case would not be transferred to the Claims Court and should remain in the district court; and, the circumstances under which monetary claims based on statutory rights should be filed, instead, in the Claims Court. The Supreme Court listed several reasons why the *Bowen* suit should not have been brought in, or transferred to, the

Claims Court. The first set of reasons was discussed in the context of the limitations on the APA waiver of sovereign immunity.

Under the APA, judicial review of federal agency decisions may only occur in a district court when "there is no other adequate remedy in a[nother] court." 5 U.S.C. § 704. The Court explained that this provision was designed to rule out duplicative procedures for the review of agency actions, and cited examples of statutory grants of jurisdiction vested in courts other than district courts for the review of the decisions of particular boards and commissions. *Bowen*, 487 U.S. at 903, 108 S.Ct. 2722. Under the facts of *Bowen*, the Court held that the Claims Court could not provide an adequate remedy for the State, and therefore held that section 704 did not bar jurisdiction in the district court under the APA. *Id.* at 904–05, 108 S.Ct. 2722.

The Supreme Court reasoned that an adequate remedy in *Bowen* would require a court to be able to exercise equitable powers, give prospective relief, manage relationships between federal and state governments over time, and consider the state-law aspects of grant-in-aid programs. *Id.* at 905–08, 108 S.Ct. 2722. The Court held that the Claims Court was not the forum that could offer this type of remedy. *Id.* at 908, 108 S.Ct. 2722. The Court also expressed doubt concerning the Claims Court's jurisdiction over a Medicaid disallowance dispute, stating that it was "likely" that Congress did not intend the Medicaid Act, 42 U.S.C. § 1396, to be a money-mandating statute providing for a cause of action for money damages. *Id.* at 907 n. 42, 108 S.Ct. 2722.

Section 702 contains another limitation on a district court's jurisdiction over APA claims. 5 U.S.C. § 702. A district court may entertain claims "seeking relief other than money damages" from plaintiffs who are alleged to have suffered legal wrongs because of federal agency action. *Id.* In *Bowen*, the State sought declaratory and injunctive relief, as well as monetary relief. 487 U.S. at 893, 108 S.Ct. 2722. The *Bowen* Court was confronted with deciding whether or not the State's monetary relief claim was indeed for "money damages." *Id.*

The Supreme Court stated that the type of money damages claims barred by section 702 are those monetary claims seeking compensation for damage sustained by the failure of the federal government to pay what is due under a statute, not claims seeking to enforce the statutory mandate for the payment of money. *Id.* at 900, 108 S.Ct. 2722. If a complex statutory payment scheme requires "intricate, ongoing relationships" between federal and state governments, and may require injunctive and declaratory powers to enforce the payment scheme, monetary claims founded on the statute in question are for specific monetary relief and not compensatory money damages. *Id.* at 901 n. 31, 108 S.Ct. 2722. The relief sought in *Bowen* could not be "properly characterized as an award of 'damages,'" because the money recovered by the State would be "usually a relatively minor [adjustment] in the size of the federal grant to the State that is payable in huge quarterly installments." *Id.* at 893, 108 S.Ct. 2722. The Supreme Court held that the Medicaid Act monetary claims asserted in *Bowen* were for "specific relief," not money damages, and were thus not barred by section 702. *Id.* at 901, 108 S.Ct. 2722. Overcoming a vigorous dissent and an otherwise supportive concurrence, the Court distinguished between the monetary relief requested in *Bowen*, described as specific relief, and the payment of money as damages. *Id.*

Taking a larger view of the Medicaid Act, the Court also decided that jurisdiction for Medicaid disallowance disputes between federal and state governments was intended by Congress to be vested in the district courts. *Id.* at 908, 108 S.Ct. 2722. The Court noted that a HHS decision finding substantial noncompliance with federal requirements in a state Medicaid program, a ruling with larger impact than a disallowance decision, may be appealed to the regional circuit court of appeals. *Id.* The Court reasoned that Congress must have intended the less momentous disputes over Medicaid disallowance decisions to go to the district courts, rather than to the Claims Court and up to the Federal Circuit. *Id.* The Court also indicated that policy questions inherent in cases affecting federal-state relations and health programming were better handled by Article III judges of district courts who possess life tenure. *Id.* at 908 n. 46, 108 S.Ct. 2722.

On the other hand, the Supreme Court commented on situations where jurisdiction would be appropriate in the Claims Court for disputes between states and the federal government over the right to payment under a given federal statute. If a statute creates a right to "compensation for specific instances of past injuries or labors," jurisdiction lies in the Claims Court, not the district courts. *Id.* at 901 n. 31, 108 S.Ct. 2722. The Court indicated that claims for the compensation of a past wrong, as opposed to claims for subsidies for future expenditures, were more properly brought in the Claims Court. *Id.* at 907 n. 42, 108 S.Ct. 2722. Suits that request a specific sum of money owed by the federal government under a given statute, as opposed to suits on an open account subject to future fluctuations, are also more appropriate for Tucker Act jurisdiction than for APA jurisdiction. *Id.* at 907, 108 S.Ct. 2722.

Finally, without specifying why, the Supreme Court remarked that the "situation" in *Chula IV* was different from the situation in *Bowen,* and pointed out that the Federal Circuit had found the Claims Court to be the "proper tribunal" to enforce the rights embodied in the federal statute at issue in *Chula IV. Id.* at 883 n. 1, 108 S.Ct. 2722. Thus, the *Bowen* majority began the practice of distinguishing the facts and issues of the Medicaid reimbursement dispute in *Bowen* from other disputes grounded in statutory rights, for the purposes of deciding the appropriate forum in which to bring monetary claims against the United States. The Federal Circuit has, in turn, had further occasion to either analogize or distinguish the facts of *Bowen* when deciding other cases where the plaintiffs have sought payment from the United States.

### b. The Federal Circuit Applies the Jurisdictional Holding in *Bowen* to a Variety of Claims

*Katz*

In *Katz v. Cisneros,* 16 F.3d 1204 (Fed.Cir. 1994), a private developer [6] participated in a subsidized housing program funded by the Department of Housing and Urban Development (HUD) and renovated 176 subsidized apartments. *Id.* at 1206. Katz began to receive rent on the apartments at a rate based, in part, on his financing costs for the project. *Id.* at 1205–06. After a HUD audit, the rental amounts were declared to be against regulation and too high. Therefore, HUD sought recovery of the overpayments. *Id.* at 1206. Katz exhausted his administrative appeals and filed suit in the United States District Court for the District of Massachusetts, seeking injunctive and declaratory relief, mandamus and monetary relief. *Id.* The district court transferred the monetary claims and the request for declaratory judgment to the Court of Federal Claims and denied or dismissed other prayers for relief, but the transfer action was appealed to the Federal Circuit. *Id.* at 1206–07. The central question on appeal was whether the district court had jurisdiction over Katz' claims and whether sovereign immunity had been waived as to defendant HUD.[7] *Id.* at 1207.

The Federal Circuit quickly disposed of the subject matter jurisdiction issue and found that federal question jurisdiction of the district court was not ousted simply because HUD alleged that the suit was based in contract and that contract cases against the United States are normally prosecuted in the Court of Federal Claims. *Id.* at 1207–08. The Circuit then turned to the *Bowen* analysis of limitations on the APA waiver of sovereign immunity pursuant to sections 702 and 704. The Circuit found that the types of relief requested in *Katz* were perfectly analogous to the relief requested in *Bowen,* such that the monetary aspects of the relief requested were not money damages but equitable relief. *Id.* at 1208–09. And, the Circuit held that an adequate remedy was not available to Katz in the Court of Federal Claims because his request for prospective relief would affect the ongoing relationships of the

---

**6.** The Hollywood Associates Limited Partnership, of which Alfred J. Katz was general partner, was the legal entity developing the property. The court refers to the plaintiff partnership as Katz.

**7.** Other entities administering the housing program at the state and local level were also named as co-defendants.

parties. *Id.* at 1209. Thus, neither of the section 702 or 704 limitations applied, and the APA waiver of sovereign immunity allowed the *Katz* suit to go forward in district court. *Id.* at 1210.

One of the factual peculiarities of the *Katz* case was that the plaintiff was not in privity with the United States—his dealings were with local and state entities which passed through the HUD funding. *Id.* Absent privity of contract with the United States, the Circuit reasoned that Tucker Act jurisdiction, based on contract breach theories, would not permit *Katz* to proceed in the Court of Federal Claims. *Id.* Thus, the Circuit found additional support for its holding that APA jurisdiction, not Tucker Act jurisdiction, allowed this suit to remain in the district court, and that the suit could not be transferred to the Court of Federal Claims. *Id.* Despite a vigorous dissent from Judge Rader asserting that the nature of the suit was for breach of contract and that a full and adequate remedy was available in the Court of Federal Claims, *id.* at 1210–13, the Circuit found that this payment dispute under the United States Housing Act of 1937, 42 U.S.C. § 1437 *et seq.*, belonged in the district court. *Katz,* 16 F.3d at 1210.

*Kanemoto*

A few months later, the Federal Circuit again had an opportunity to apply the *Bowen* analysis to the issue of whether a case begun in a district court should be transferred to the Court of Federal Claims, *Kanemoto v. Reno,* 41 F.3d 641 (Fed.Cir.1994). Ms. Kanemoto and other plaintiffs had been interned and then relocated to Japan during World War II. *Id.* at 642. A reparations statute was passed in 1988 which offered apologies and $20,000 to persons of Japanese descent who had been sent to internment camps. *Id.* at 642–43. However, Ms. Kanemoto was refused the reparation funds because the statute excluded persons relocated to other countries during the war. *Id.* at 643. She and the other plaintiffs brought suit in the United States District Court for the Northern District of California, and the government moved to transfer the case to the Court of Federal Claims. *Id.* When the motion was denied, the Federal Circuit heard the appeal and addressed the question of "whether Kanemoto's claim was brought in the appropriate forum." *Id.*

After an extensive discussion of the limitations on the APA waiver of sovereign immunity found in sections 702 and 704, and a review of the holding in *Bowen,* the Circuit held that Ms. Kanemoto had an adequate remedy in the Court of Federal Claims and was thus precluded by section 704 from proceeding in the district court under the APA. *Id.* at 644–46. The Federal Circuit explained that "the ultimate relief Kanemoto seeks in all counts of the complaint is the payment to her of the $20,000 statutory amount of restitution." *Id.* at 646. Because the monetary relief sought, if granted, would compel payment of the statutory amount of restitution, no declaratory or injunctive relief was required. *Id.* Although the Federal Circuit did not assign a label of either "money damages" or "specific relief" to such an award, the Circuit did note that the Court of Federal Claims has the power to provide specific relief in the form of money. *Id.* (citing *Bowen,* 487 U.S. at 900 n. 31, 108 S.Ct. 2722). Although specific relief in monetary form falls under APA jurisdiction in the Medicaid disallowance dispute context, the Federal Circuit determined that in other statutory schemes specific relief in monetary form may be sought in this court. *Id.* The Circuit distinguished the rights arising from the reparations statute from the rights arising under the Medicaid Act at issue in *Bowen* because the reparations statute, 50 U.S.C. § 1989b–4(a)(1), did not contemplate a complex payment scheme nor an ongoing, intricate relationship between the parties. *Id.* at 647.

*Brighton Village*

About a year after *Katz,* the Federal Circuit revisited the jurisdictional question of whether a subsidized housing payment dispute involving HUD would lie in the Court of Federal Claims. *Brighton Vill. Assocs. v. United States,* 52 F.3d 1056 (Fed.Cir.1995). In an opinion written by Judge Rader, the author of the dissent in *Katz,* the Federal Circuit determined that *Brighton Village* was a contract case requesting money damages and was properly brought in the Court of Federal Claims. *Id.* at 1060. The *Brighton*

*Village* court, unlike the *Katz* court, did not rely on *Bowen* to resolve the jurisdictional question.

The Circuit commented that several features of *Bowen* were absent in subsidized housing payment contracts:

> *Bowen*, however, did not address the Section 8 housing program, but the Medicaid program. In concluding that a Medicaid disallowance claim was not a contract action, *Bowen* relied on the congressional intent for the Medicaid program, the role of state law in Medicaid disallowance actions, and the long-term Medicaid interactions between the states and the Federal Government involving ever-shifting balance sheets. *Bowen*, 487 U.S. at 903–05 & n. 39, 108 S.Ct. at 2737 & n. 39. None of these features unique to Medicaid disallowance disputes applies to Section 8 housing contracts.

*Id.* at 1059 n. 3. The court relied instead on precedent, holding that, despite *Bowen*, "[t]he Court of Federal Claims has the power to award money damages on contract claims under the Tucker Act." *Id.* at 1060 (relying on 28 U.S.C. § 1491(a)(1) and numerous cases). The Circuit distinguished the contrary result in *Katz* by stating that Brighton Village Associates was in privity with the United States in a housing payment agreement and thus contract law, not a statutory right to payment, was the source of the relief sought. *Id.* The Circuit also noted that Katz sought prospective relief, whereas Brighton Village Associates sought retroactive monetary relief. *Id.*

### NCMS

The plaintiff in *National Center for Manufacturing Sciences v. United States*, 114 F.3d 196 (Fed.Cir.1997) (*NCMS*), filed in the United States District Court for the District of Columbia and sought, under both statutory entitlement and contract theories, to compel the United States Air Force (USAF) to release the remaining portion of $40,000,000 that had been appropriated for NCMS by Congress. *Id.* at 197–98. The $40,000,000 appropriation was governed by a cooperative agreement between USAF and NCMS, although only a portion of the $40,000,000 was described in that agreement as " 'currently available and allotted.' " *Id.* at 198. The district court held that the case was founded on contract and transferred the *NCMS* case to the Court of Federal Claims. *Id.* On appeal, the Federal Circuit disagreed, found district court jurisdiction under the APA and reversed the transfer order. *Id.* at 202.

The Circuit discussed *Bowen, Katz* and *Kanemoto*, and applied the holdings of these decisions to the facts in *NCMS. Id.* at 198–202. Because the request for payment under the statute was not for compensatory money damages but for a statutory entitlement, NCMS did not run afoul of section 702 and the APA waived sovereign immunity for its $15,875,000 claim. *Id.* at 200. The court also held that an adequate remedy could not be provided by the Court of Federal Claims with an award of monetary relief. *Id.* at 200–02. Rather, a prevailing NCMS would require injunctive relief reserving unspent USAF funds for NCMS, and the restrictions on the congressional appropriation embodied in either the statute or the cooperative agreement would require an ongoing, cooperative relationship between the parties. *Id.* at 201–02. Therefore, section 704 proved no impediment, and *NCMS* was found to be akin to *Bowen* and *Katz* and distinguishable from *Kanemoto*—with jurisdiction in the district court under the APA.[8] *Id.* at 201–02.

The Circuit also decided that the Court of Federal Claims did not have the power to dispense the forms of equitable relief that were at issue in *NCMS. Id.* The existing cooperative agreement was only allotted a little more than half of the congressional appropriation. In order for NCMS to obtain

---

8. The Circuit also pointed out that in *NCMS* the United States had fought against jurisdiction in the district court and had argued for transfer to the Court of Federal Claims before the Circuit, but also intended to move for dismissal on the basis of lack of jurisdiction in the Court of Federal Claims if the transfer were to be successful. 114 F.3d at 199. The Circuit complained that this round of litigation over the proper forum was a waste of time and resources. *Id.* at 197. The Circuit expressed a concern that this "search [for] a court that can reach the merits of NCMS's claims" should not be allowed to deteriorate into a repetitive and pointless forum-hopping exercise if the jurisdictional issue could be resolved in one step. *Id.* at 199.

all of the appropriation it requested, a court would have to direct the USAF to obligate the remainder of the funding and to supplement the old agreement or replace it with a new one that extended the contracting relationship of the parties both in time and over the newly allotted funds. The Circuit explained that the Court of Federal Claims did not possess jurisdiction to give that sort of equitable relief and remanded the case to the district court.

*Brazos*

In 1998, the Federal Circuit again addressed whether the holding in *Bowen* would support the transfer of a case from a district court to the Court of Federal Claims. *Brazos Elec. Power Co-op., Inc.*, 144 F.3d 784 (Fed.Cir.1998) (*Brazos*). In *Brazos*, a power cooperative filed suit in the United States District Court for the Western District of Texas to contest the charge of a prepayment penalty on a loan amount repaid to the United States. *Id.* at 786. The district court decided it did not have jurisdiction under the APA because an adequate remedy existed in the Court of Federal Claims. The Federal Circuit agreed.

The Circuit first examined whether the power cooperative's claim was for money damages. *Id.* at 787. Cancellation of a debt, the court reasoned, is just another form of monetary damages and, therefore, the relief requested was within Tucker Act jurisdiction. Next, the court examined whether section 704, the bar on APA suits when an adequate remedy exists in another court, prevented a waiver of sovereign immunity under the APA. The Circuit held that the power cooperative was seeking "a single, uncomplicated

payment of money" and that this was "an entirely adequate remedy." *Id.* at 788. Unlike the situation in *Bowen*, where a court might have to oversee an ongoing Medicaid reimbursement relationship, in *Brazos* "[n]o prospective relief would be required and there would be no ongoing relationship to monitor and referee." *Id.* Finally, the Circuit determined that the claims in *Brazos* were contractual in nature. Despite the incorporation of certain statutory terms and conditions in the note held by the United States, the contract dispute between the parties "d[id] not concern the administration of that statute." *Id.* For these reasons, the District court did not have jurisdiction under the APA and the transfer of *Brazos* to the Court of Federal Claims was upheld.

*Con Ed II*

In 2001, the Federal Circuit again examined the *Bowen* jurisdictional holding and took the unusual step of vacating, *en banc*, a panel decision, *Consol. Edison Co. of N.Y. v. United States Dep't of Energy*, 234 F.3d 642 (Fed.Cir.2000) (*Con Ed I*), and resubmitting the appeal to the same panel which then issued a revised opinion. *Consol. Edison Co. of N.Y., Inc. v. United States Dep't of Energy*, 247 F.3d 1378, 1386 (Fed.Cir.2001) (*Con Ed II*).[9] The revised opinion in *Con Ed II* held that *Bowen* was distinguishable from *Con Ed II*; that jurisdiction for the type of relief claimed in *Con Ed II* lies in the Court of Federal Claims; and that this court's adequate remedy ousted APA jurisdiction in the district court pursuant to section 704. *Id.* at 1383–86. *Con Ed I* had reached the opposite conclusion on all of these points. 234 F.3d at 646–47.[10] The court examines *Con Ed II* in detail.

---

**9.** The *Con Ed II* opinion, although not an *en banc* decision of the Circuit, appears to have had extensive support within the Circuit at the time, because the judges unanimously voted to rehear the appeal and voted in favor of "return[ing] this appeal to the merits panel." *Con Ed II*, 247 F.3d at 1380, 1386. This support persists. For example, about six months after *Con Ed II*, the Federal Circuit mooted, *en banc*, a motion to stay proceedings in the Court of Federal Claims to await a district court decision on a request for equitable relief related to the same subject matter because *Con Ed II* had already decided the jurisdictional issue in favor of the Court of Federal Claims. *See Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1337–38 (Fed.Cir.2001)

(*en banc*) (stating that "we note that the decision of the Court of Federal Claims to deny [Commonwealth] Edison's request for a stay of those proceedings pending resolution of the [district court] action is now moot [as an issue under appeal], in light of our decision in [*Con Ed II*]").

**10.** The concurrence in *Con Ed II* suggested that the Circuit was "under-ruling" *Bowen* and stated that "it remains to be seen whether the Supreme Court will [disagree with *Con Ed II*]." *Con Ed II*, 247 F.3d at 1386. The Supreme Court, however, denied a petition for writ of *certiorari, Consol. Edison Co. of N.Y. v. United States Dep't of Energy*, 534 U.S. 1054, 122 S.Ct. 644, 151 L.Ed.2d

In an opinion written by Judge Rader, the Federal Circuit described the litigation history of *Con Ed II*, 247 F.3d at 1380–82. At the heart of the suit was a dispute over payments required from nuclear power utilities under the Energy Policy Act of 1992, 42 U.S.C. § 2297g (EPACT). *Id.* at 1380–81. After making initial payments under EPACT, some nuclear power utilities sued in the Court of Federal Claims for refunds of the payments. *Id.* at 1381. One of those cases rose on appeal to the Federal Circuit, *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569 (Fed.Cir.1997), and the plaintiff-utility lost. 247 F.3d at 1381. A petition for writ of *certiorari* was also denied. *Yankee Atomic Elec. Co. v. United States*, 524 U.S. 951, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998). Some of the utilities, apparently unhappy with their track record before the Court of Federal Claims, "sought a hearing in another forum." *Con Ed II*, 247 F.3d at 1381.

Twenty-two nuclear power utilities filed a suit in the United States District Court for the Southern District of New York seeking declaratory judgments and injunctive relief against the required payments under EPACT. *Id.* at 1380. The district court refused a request to transfer the case to the Court of Federal Claims and found that it had jurisdiction for the suit under the APA. *Id.* at 1382. On appeal, the Federal Circuit applied the holding in *Bowen* and initially affirmed the district court's jurisdictional decision, *Con Ed I*, 234 F.3d at 647–48, over a vigorous dissent by Judge Gajarsa, *id.* at 648–54. Judge Gajarsa opened his dissent with a succinct description of his disagreement with *Con Ed I*:

> I respectfully dissent from the majority opinion for two reasons. First, I believe that the majority's analysis is in direct conflict with Supreme Court precedent, precedent of this court, and the statutory scheme promulgated by Congress, which provides for judicial review pursuant to the Administrative Procedure Act only when no other adequate remedy is available. Second, the majority opinion allows the plaintiffs an opportunity to collaterally at-

562 (2001), with the result that this court is now bound by the *Con Ed II* interpretation of the

tack a clear and controlling precedent of this court and moreover it frustrates the legislative purpose of the Tucker Act.

*Id.* at 648. In Judge Gajarsa's view, "the district court lack[ed] jurisdiction under Section 702 because the [Court of Federal Claims] can provide an adequate remedy for the purposes of Section 704." *Id.* at 654.

In *Con Ed II*, Judge Gajarsa joined in the panel's unanimous decision to adopt the result suggested by his dissent in *Con Ed I*, 247 F.3d at 1386. The court reversed the district court's jurisdictional decision and remanded with instructions to transfer the case to the Court of Federal Claims. The Federal Circuit revised its assessment of the applicability of *Bowen* as it distinguished the facts of *Bowen* from the facts of *Con Ed II*. The Federal Circuit also paused to reflect on the dangers of the unbridled forum shopping that might result if plaintiffs could use *Bowen* to circumvent the exclusive Tucker Act jurisdiction of the Court of Federal Claims and the precedent of the Federal Circuit that is binding upon this court. *See id.* at 1385 ("This court and its sister circuits will not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims.") (citing cases).

The court now turns to the Federal Circuit's commentary on the applicability of *Bowen* to different types of disputes, and next, to the Federal Circuit's discussion of money judgments, *res judicata*, and retrospective versus prospective relief.

The court in *Con Ed II* rested its decision on section 704, finding that APA jurisdiction had been trumped by the existence of an adequate remedy in the Court of Federal Claims. *Id.* at 1385–86. *Bowen*, to be sure, had held that in that Medicaid reimbursement dispute, an adequate remedy did not exist in the Court of Federal Claims. The Federal Circuit proceeded to identify aspects of the dispute in *Con Ed II* that could be distinguished from the facts of *Bowen*.

First, the Federal Circuit declared that *Bowen* "does not enunciate a broad rule that

jurisdictional holding in *Bowen*.

the Court of Federal Claims cannot supply an adequate remedy in any case seeking injunctive relief." *Id.* at 1383. Second, the court noted that "the Supreme Court's ruling in *Bowen* emphasized the complexity of the continuous relationship between the federal and state governments administering the Medicaid program," *id.*, and that the Supreme Court had "le[ft] room for the proposition that the Court of Federal Claims may well supply an adequate remedy in cases without a complex ongoing federal-state interface," *id.* (citing *Kanemoto*, 41 F.3d at 645). Third, the court noted that the Supreme Court had expressed doubt about jurisdiction in the Court of Federal Claims for the Medicaid disallowance decisions in *Bowen*, but this concern was not present in *Con Ed II's* disputes over constitutional issues such as illegal exactions, an area over which this court "has long possessed jurisdiction." *Id.* at 1384. Fourth, the Federal Circuit pointed out that the issues in *Bowen*, unlike the utilities' claims in *Con Ed II*, " 'typically involve state governmental activities' " better understood and evaluated by a district court than by " 'a single tribunal headquartered in Washington.' " *Id.* (quoting *Bowen*, 487 U.S. at 907–08, 108 S.Ct. 2722). Fifth, the controversy in *Bowen* implicated " '[m]anaging the relationships between States and the Federal Government that occur over time and that involve constantly shifting balance sheets,' " *id.* (quoting *Bowen*, 487 U.S. at 904 n. 39, 108 S.Ct. 2722), whereas *Con Ed II* did not implicate "government-to-government" relationships. *Id.* Because of these distinguishing characteristics, the Federal Circuit decided that "the Supreme Court linked its judgment [in *Bowen*] to a specific set of circumstances that are not present in this case [(*Con Ed II*)]," and held that *Bowen* did not preclude the Court of Federal Claims from providing an adequate remedy for the claims of the nuclear power utilities. *Id.*

The Federal Circuit also explained how a money judgment in the Court of Federal Claims offers complete relief to a party seeking equitable relief such as a declaratory judgment and an injunction of required payments. *Id.* at 1384. The court reasoned that the nuclear power utilities in the district court, despite the drafting of their complaint,

"in reality [were] seek[ing] only prospective monetary relief" from the required payments under EPACT. *Id.* at 1385. In the Court of Federal Claims, these same plaintiffs had claims pending for retrospective monetary relief, seeking the return of their initial payments under EPACT. The Federal Circuit held that a money judgment in the Court of Federal Claims would provide an adequate remedy for both sets of claims.

The mechanism for providing such complete relief would be the principle of *res judicata*. *Id.* at 1384–85. Should the utilities win in the Court of Federal Claims, not only would they recoup their initial payments with interest, but the United States would be bound by the ruling under the principle of *res judicata* and could no longer require unlawful payments under EPACT. "[A]n explicit grant of prospective relief" would not be necessary. *Id.* at 1384. Because the nuclear power utilities could receive an adequate remedy in the Court of Federal Claims, section 704 deprived the plaintiff-utilities "of duplicative district court adjudication." *Id.* at 1386.

To the court's knowledge, the holding in *Con Ed II* has not yet been commented on, approved or disapproved by the Supreme Court. The Federal Circuit has continued to apply the principles discussed in *Con Ed II* in other decisions weighing Tucker Act and APA jurisdiction.

*Christopher Village*

Although *Christopher Village, L.P. v. United States*, 360 F.3d 1319 (Fed.Cir.2004), was decided primarily on breach of contract theories rather than on statutory entitlements, the Federal Circuit again relied on section 704, as interpreted in *Con Ed II*, to determine that no APA jurisdiction existed over a claim for equitable relief when an adequate remedy could be had in the Court of Federal Claims. *Id.* at 1327–29. A request for "a declaratory judgment as to the legality of HUD's actions" related to troubled subsidized housing contracts with the owners of a housing complex would not lie in the district court because a suit for money damages in the Court of Federal Claims would provide an adequate remedy. Because all

requests for injunctive relief were moot due to the foreclosure on and razing of the subject property, the remaining claim requested relief which would simply act as the predicate basis for a money judgment in the Court of Federal Claims. As a result, the Federal Circuit declared that APA jurisdiction over that claim was barred by the adequate remedy available in this court.

The Federal Circuit explained that *Con Ed II* had held "that a litigant's ability to sue the government for money damages in the Court of Federal Claims is an 'adequate remedy' that precludes an APA waiver of sovereign immunity in other courts." *Id.* at 1327 (citing *Con Ed II*, 247 F.3d at 1384). The court then quoted *Con Ed II* for the proposition that *Bowen* had not announced a " 'broad rule' " denying the adequacy of Court of Federal Claims remedies for claims that requested injunctive relief, and for the determination that the *Bowen* holding was focused on particular circumstances and considerations. *Id.* at 1328 n. 2 (quoting *Con Ed II*, 247 F.3d at 1383). The *Christopher Village* court's citation to *Con Ed II* confirms that the interpretation of *Bowen* in *Con Ed II* continues to be the controlling law in this circuit.

*Doe*

Only a couple of months after *Christopher Village* was issued, another panel of the Federal Circuit explored the boundary between Tucker Act and APA jurisdiction. *Doe v. United States*, 372 F.3d 1308 (Fed.Cir.2004). Plaintiff–Doe, the spouse of a member of the armed services, sought equitable relief in a district court in order to obtain a government-funded abortion when she found out her anencephalic fetus would never attain consciousness and had a fatal abnormality. *Id.* at 1310–11. The Federal Circuit had to decide whether her claim was encompassed within Tucker Act jurisdiction or APA jurisdiction.[11] Although her claim, if successful, would entail a payment of money by the United States, the Federal Circuit held that her claim was not a simple request for mone-

tary damages that would fall under Tucker Act jurisdiction:

> The fact that the injunctive relief Doe sought would ultimately involve a transfer of money, i.e., a payment by the government to the medical service provider that would perform her abortion, did not bring her complaint under the Little Tucker Act; it is not enough that the injunctive relief sought by a plaintiff, if granted, would cause the defendant to expend money.

*Id.* at 1313–14 (citing *Bowen*, 487 U.S. at 893, 900–01, 108 S.Ct. 2722; *NCMS*, 114 F.3d at 202; *Katz*, 16 F.3d at 1208–09; *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 796–97 (Fed.Cir.1993)).

Although the merits of plaintiff-Doe's claim concerned an alleged unconstitutional violation of due process, the jurisdictional question turned on the nature of the relief she sought. *Id.* at 1310, 1313. The Federal Circuit analyzed her claims and found that the relief requested was "only an injunction requiring [the United States] to authorize payment for the abortion and related services, and a declaration that the statutory and regulatory prohibition on paying for aborting anencephalic pregnancies was unlawful." *Id.* at 1313. The Circuit ruled out the possibility that Doe's request for equitable relief was simply a claim for money damages in disguise, as was the case in *Brazos*, *Con Ed II* and *Christopher Village*. *Id.* First, the court noted that the injunction would force the government to provide a service, rather than a payment to the plaintiff. Second, the harms plaintiff sought to avoid were the psychological and physical effects of carrying an anencephalic fetus to term, harms that could not be remedied by a simple payment of money damages after the fact. Third, the court noted that prospective monetary relief would not have been available to redress the plaintiff's alleged inability to pay for an abortion, in that the government's health care system "provides no mechanism for prospective financing of anticipated medical procedures, and hence there would be no money-mandating statute or

---

11. The complaint was filed in district court and asserted jurisdiction under both the Little Tucker Act, 28 U.S.C. § 1346(a)(2) (2000), and the APA. *Doe*, 372 F.3d at 1310. If only APA jurisdiction

would lie for the claim, the appeal, which started in the Federal Circuit, would necessarily be transferred to the regional circuit court. *Id.* at 1311–12.

regulation on which to base such a judgment." *Id.* (citing 32 C.F.R. § 199.7(f)(4)). Because the suit demanded equitable relief and could not be read to present a claim for money damages, the Circuit found that Tucker Act jurisdiction did not lie.

Finally, the Federal Circuit distinguished a similar appeal it had decided on the same day, *Britell v. United States*, 372 F.3d 1370 (Fed.Cir.2004), another challenge to the ban on government-funded abortions by the spouse of a member of the armed services. *Doe*, 372 F.3d at 1316–17. As the Federal Circuit explained,

> *Britell* is similar to this case in that it involved a military dependent who sought to have the military dependents' medical care system pay for an abortion to terminate her anencephalic pregnancy. Despite the similarity in the facts, however, *Britell* differs procedurally from this case in an important respect. In *Britell*, the plaintiff obtained an abortion on her own and paid for it herself before filing suit against the government. Accordingly, her lawsuit simply sought reimbursement of the costs of the abortion and the related medical services. Her action was therefore clearly and solely for money damages and thus fell squarely within the Little Tucker Act. In this case, by contrast, Doe from the outset sought injunctive relief, not money damages. She claimed, and the district court ruled, that the after-the-fact payment of money damages would not have been an adequate remedy in her case. She was not requesting reimbursement, but was requesting the provision of a service that she was unable to obtain on her own. While the government's payment of money to the [health-care] provider was required to ensure that Doe would receive that service,

her request was nonetheless for equitable relief, not damages.

> After the government provided Doe's abortion pursuant to the injunction, Doe had no further claim against the government for money damages. In the aftermath of the abortion, the government moved to dismiss the complaint, presumably to set the stage for an action to recover the expenses of the abortion from Doe, and Doe moved for judgment on the pleadings, presumably to obtain a judgment that she could invoke to resist such an action. Unlike *Britell*, however, this case never became an action against the government for money damages, and it thus never became an action under the Little Tucker Act.

*Id.* at 1316–17 (citation omitted). Because the nature of the relief requested in *Doe* was not initially, and did not become, a request for money damages so as to deny APA jurisdiction under section 702, the district court had jurisdiction over the suit under the APA.

### c. The Decisive Factor for Determining Whether This Court Has Jurisdiction under *Bowen*

The jurisdictional holding in *Bowen* is complex. Indeed, the subsequent decisions of the Federal Circuit interpreting the jurisdictional holding of *Bowen*, a few of which are described *supra*, offer a kaleidoscopic view of *Bowen* as it applies to various jurisdictional controversies. However, it is possible to discern one primary factor that in this case is determinative of whether this court, or a district court, has jurisdiction over the claims in Count I. The pivotal question is whether this court can provide the District with an adequate remedy in its quest for reimbursement for the mental health care of certain individuals described by the Transfer Act.[12]

---

12. The other principal inquiry in *Bowen* was whether the State was seeking money damages, a type of claim excluded from APA jurisdiction by section 702, or specific relief. However, as the Federal Circuit has shown in *Con Ed II* and in *Kanemoto*, when an adequate remedy exists in the Court of Federal Claims and APA jurisdiction is ousted pursuant to 5 U.S.C. § 704, there is no need to decide whether the relief requested is in essence money damages or equitable relief in the form of money. *See Con Ed II*, 247 F.3d at 1382

(stating that "the court need not address the § 702 limitation in this case because another limitation on APA review [in section 704] precludes district court review"); *Kanemoto*, 41 F.3d at 646 (stating that because the plaintiff had an adequate remedy under section 704, "jurisdiction for this action is not available under the APA and we need not reach the question of whether the relief sought by Kanemoto is 'relief other than money damages' under [5 U.S.C. §] 702 of the APA").

This court's remedy qualifies as adequate pursuant to section 704 if it can provide all of the plaintiff's requested relief. *Kanemoto,* 41 F.3d at 646. If the claims asserted are purely for retrospective relief based on a money-mandating statute, an adequate remedy exists in the Court of Federal Claims. *See id.* at 646–47; *see also Doe,* 372 F.3d at 1316–17 (distinguishing Tucker Act jurisdiction over "reimbursement" claims from APA jurisdiction over requests for injunctive relief, where an "after-the-fact payment of money damages would not [provide] an adequate remedy"); *Brighton Village,* 52 F.3d at 1060 (finding no jurisdiction under the APA, in part, because the *Brighton Village* plaintiffs were seeking "retroactive monetary relief," not "prospective relief"). If, however, a plaintiff seeks retrospective relief but the controversy will also implicate future financial and legal relationships between the parties, the court must determine whether a "naked money judgment" will provide an adequate remedy. *See Bowen,* 487 U.S. at 905, 108 S.Ct. 2722 ("We are not willing to assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief . . . .").

In this case a money judgment would be an adequate remedy for the claims in Count I. The financial relationship linking the District and HHS implicated by the claims in Count I most resembles the relationship of the parties in *Con Ed II.* Embodied in their duplicative suits, the nuclear power utilities had retrospective and prospective claims concerning a tax they were required to pay regularly to the United States. *See Con Ed II,* 247 F.3d at 1385 ("Con Ed's case for retrospective monetary relief before the Court of Federal Claims overlaps with its claims for prospective monetary relief before the district court."). The utilities desired a refund of past payments and an injunction against future payments of the tax. The

arguments concerned whether the tax was constitutional. Here, the United States resists paying for the mental health services that the District alleges are promised reimbursement by the Transfer Act. The dispute has both retrospective aspects, i.e., for the past years of mental health services provided and described in the complaint, as well as prospective aspects, i.e., for future mental health services not described in the complaint. The dispute is over the interpretation of the Transfer Act. This type of ongoing payment dispute has an adequate remedy in the Court of Federal Claims, because when the retrospective claims are resolved, the question of law will have been answered and the court's decision will govern the future financial relationship of the parties through the principle of *res judicata. See id.* at 1385 (stating that "[r]elief from [plaintiffs'] retrospective obligations will also relieve [plaintiffs] from the same obligations prospectively" because of *res judicata*). Because an adequate remedy for the District exists in the Court of Federal Claims, there is no jurisdiction over this dispute pursuant to the APA, and this court is the appropriate forum to decide the claims in Count I.

Nothing in *Bowen* commands a different result. Although the *Bowen* Court held in that case that the State's claims did not run afoul of section 704 "because the doubtful and limited relief available in the Claims Court is not an adequate substitute for review in the District Court," 487 U.S. at 901, 108 S.Ct. 2722, the Medicaid statute and payment issues in *Bowen* are readily distinguishable from the Transfer Act and payment controversy here. Litigation between a state and the United States over Medicaid reimbursement policy decisions involves interpreting statutes, regulations, federal agency policies, and state law and policy governing a large and complex cooperative venture.[13]

**13.** HHS describes Medicaid as
 a jointly funded cooperative venture between the Federal and State governments to assist States in the provision of adequate medical care to eligible needy persons. Medicaid is the largest program providing medical and health-related services to America's poorest people. Within broad national guidelines which the

Federal government provides, each of the States:
establishes its own eligibility standards;
determines the type, amount, duration, and scope of services;
sets the rate of payment for services; and administers its own program.

As the *Bowen* Court noted, a Medicaid disallowance dispute will "typically involve state governmental activities" and "the construction of state law." 487 U.S. at 907–08, 108 S.Ct. 2722. A Medicaid disallowance dispute is also not merely monetary in nature, because " 'the legal issues involved have ramifications that affect other aspects of the Medicaid program. What is at stake ... is the scope of the Medicaid program, not just how many dollars [the State] should have received in any particular year.' " *Id.* at 889–90, 108 S.Ct. 2722 (quoting the underlying First Circuit decision, *Massachusetts v. Sec'y of Health and Human Servs.*, 816 F.2d 796, 799 (1st Cir.1987)). Because a Medicaid disallowance dispute requires extensive review of state law and the court's intervention in policy decisions, the Supreme Court favored the district courts for that kind of dispute. *Id.* at 907–08 & n. 46, 108 S.Ct. 2722.

Here, the Transfer Act, as it relates to mental health services, identifies in a few short phrases three categories of individuals whose care shall be reimbursed by the federal government. 24 U.S.C. § 225g(b)(1). There is no federal agency policy to interpret, no regulatory framework, and no local law issues that affect the simple transaction of HHS paying the bill for these mental health services. Thus, this court is an appropriate forum for resolving the claims in Count I, because none of the concerns of the Supreme Court in *Bowen* regarding the inter-governmental complexities of the Medicaid program are applicable to this case.

It is also clear that the payment issues in *Bowen* were far more convoluted than the payment issues here. Indeed, the size and complexity of a State's ongoing Medicaid accounting relationship with the United States goes far beyond simple reimbursement by the federal government for delivered services:

> Although the federal contribution to a State's Medicaid program is referred to as a "reimbursement," the stream of revenue is actually a series of huge quarterly advance payments that are based on the State's estimate of its anticipated future expenditures. The estimates are periodically adjusted to reflect actual experience. Overpayments may be withheld from future advances or, in the event of a dispute over a disallowance, may be retained by the State at its option pending resolution of the dispute.

*Bowen,* 487 U.S. at 883–84, 108 S.Ct. 2722 (footnotes omitted). Here, the Transfer Act requires only that the federal government pay for the mental health services of certain individuals. This is a straightforward reimbursement scheme, and well-suited to the adjudication of the rights of the parties, if necessary, through litigation in this court.

One of the reasons advanced by the Supreme Court in *Bowen* for its holding that the district court was the appropriate forum for a Medicaid disallowance dispute was that "the quarterly payments of federal [Medicaid] money are actually advances against expenses that have not yet been incurred by the State," so that the Claims Court would have difficulty in awarding a money judgment when the State might not be able to show a specific sum was owed to it. *Id.* at 907, 108 S.Ct. 2722. Here, once the statutory terms of the Transfer Act have been interpreted by this court, the District has only to account for the costs of services provided that fall under the statutory provisions of 24 U.S.C. § 225g(b)(1). Therefore, this court does not face the disjunctive accounting intricacies of *Bowen* and can provide an adequate remedy in a money judgment that is within its powers to calculate. Subsequently, the parties will surely be able to follow the court's guidance and adhere to the billing and reimbursement scheme mandated by the Transfer Act.

Finally, although the jurisdictional analysis in *Bowen* does not depend on an argument based upon judicial economy, it does appear that protracted litigation over jurisdiction is

Thus, the Medicaid program varies considerably from State to State, as well as within each State over time.
United States Department of Health and Human Services, The Centers for Medicare and Medicaid Services, *Overview of the Medicaid Program,* available at http://www.cms.hhs.gov/medicaid/mover.asp (last visited August 10, 2005).

to be discouraged when a case is proceeding in an appropriate forum. The holding in *Bowen* affirmed a long-standing assumption of jurisdiction by the district courts over Medicaid disallowance decisions and rejected "the novel proposition that the Claims Court is the exclusive forum for judicial review of th[at] type of agency action." 487 U.S. at 882–83 & n. 1, 108 S.Ct. 2722. The result was an affirmance of the district court's ruling on the merits of the dispute, rather than a transfer to the Claims Court for another round of litigation. *Id.* at 912, 108 S.Ct. 2722. Similarly, in *Con Ed II*, the Federal Circuit commented that an attempt to avoid jurisdiction in the Court of Federal Claims by "deleting all reference to monetary recovery and instead seeking a declaratory judgment and an injunction" in the district court would not be tolerated. 247 F.3d at 1385. The result in *Con Ed II* was to transfer the utilities' prospective claims from the district court to the Court of Federal Claims, where the utilities' retrospective claims were already being litigated. *Id.* at 1386. The Circuit also expressed concern for judicial economy in *NCMS*, as discussed *supra* in note 8, by its criticism of defendant's strategy of fighting against jurisdiction in the district court and requesting transfer to the Claims Court, while at the same time planning to fight jurisdiction in the Claims Court if the transfer were to occur. 114 F.3d at 199.

In the instant case, the court notes that defendant's invocation of *Bowen* to challenge Tucker Act jurisdiction over the claims in Count I is somewhat perplexing.[14] When the United States sued the District in the United States District Court for the District of Columbia over an alleged violation of federal law at Saint Elizabeths after the hospital was being operated by the District, the District counterclaimed on the basis of an alleged failure of the United States to fulfill its financial obligations under the Transfer Act. Def.'s Reply at 1 n. 1. In that suit, the United States apparently argued that the District's counterclaim was subject to Tucker Act jurisdiction and would not lie in the district court.

*See id.* (stating that "Defendant now believes the remaining issues of Count I ... are not subject to Tucker Act Jurisdiction ... [although a] contrary argument on Tucker Act jurisdiction was proffered by the United States in the prior related action, *United States v. District of Columbia,* Civ. No. 91–3324 (D.D.C.)"). Because this court has jurisdiction over the claims in Count I, in the interests of judicial economy the court sees no reason to relinquish that jurisdiction and thus condemn this dispute to another wasteful round of litigation over where to litigate.

### 2. Subject Matter Jurisdiction Over Count IV

■ Defendant argues, with respect to repairs and renovations of the Hospital, that this court lacks jurisdiction over the District's claims in Count IV because the applicable section of the Transfer Act regarding the physical plant audit does not contain language directing the payment of funds to the District. The court must decide whether the Transfer Act mandates the payment of money for the repairs and renovations of Saint Elizabeths contemplated by the Act. *See Fisher,* 402 F.3d at 1173. This inquiry must take into account the 1991 amendment to the Act which allows the Secretary of HHS to pay for these repairs directly, such as by hiring contractors to do the work, or, in the alternative, to enter into an agreement with the District wherein HHS would pay the District to complete the repairs and renovations, itself. 24 U.S.C. § 225b(f)(2)(A), (C).

The court finds subject matter jurisdiction for the claims in Count IV. The Transfer Act required HHS to conduct a financial and physical plant audit of all existing facilities at the Hospital by January 1, 1986. *Id.* § 225b(f)(1). The physical plant audit was necessary to identify any relevant national and District code deficiencies and to estimate the useful life of the existing facility support systems. HHS was required to initiate, no later than October 1, 1987 and to complete, no later than October 1, 1993, such repairs

---

**14.** Defendant has settled similar claims in Counts II, III and most of Count VI, and has admitted to some payment liability for the claims in Count I. *See* Def.'s Mot. at 1 n. 2 (stating that

"defendant does not dispute that it owes the District for the payment of some patient services").

and renovations to the physical plant and facility support systems of the Hospital that were to be utilized by the District under the system implementation plan as part of the District's comprehensive mental health system. *Id.* § 225b(f)(2).

HHS contracted with AEPA to conduct and complete the audit by January 1986. Once the audit was completed, HHS was to complete the repairs and renovations identified in the audit by October 1, 1993. The 1991 amendment to the Act allowed the District and HHS to agree that the District would conduct the repairs and renovations itself. *Id.* § 225b(f)(2)(A), (C). The parties have acknowledged that such an agreement occurred. *See* Def.'s Reply at 10 (stating that correspondence between the District and HHS "further memorialize[s] an agreement between the Secretary and plaintiff as contemplated by [section 225b(f)(2)(C) of] the Transfer Act"); Pl.'s Reply at 30 n. 24 ("This obligation to provide the [repair and renovation] funds is triggered if HHS and the Mayor agree, as they did, that HHS will provide the funds to the Mayor to complete the repairs and renovations instead of HHS completing the repairs and renovations itself.").

The AEPA audit estimated building repair and renovation costs to total $15,983,366 for the buildings the District would permanently incorporate into its mental health system. Pl.'s Facts ¶ 24. The AEPA audit also estimated the costs of repairs to facility support systems and infrastructure, including the electrical distribution system, elevators, sanitary sewer system, storm sewer system, water distribution system, steam distribution system, steam plant, tunnels, roads, parking lots, and historical wall, to total $16,997,258. *Id.;* Pl.'s App. at 810, ¶ 3 (Burnette Aff.). This cost estimate included the repairs and renovations of those portions of the facility support systems and infrastructure that supported the use of the permanent buildings. Pl.'s App. at 810, ¶ 3 (Burnette Aff.). Thus, plaintiff alleges that the total liability of the

United States, in 1986 dollars, was for $32,980,624 pursuant to the AEPA audit estimates for repairs and renovations. Pl.'s Mot. at 17.

Plaintiff claims that HHS did not provide sufficient funds to make the repairs and renovations necessary for the permanent buildings. Plaintiff asserts that defendant paid only $20,675,000 of the required $32,980,624, leaving a balance of $12,305,624 unpaid and owing. Pl.'s Mot. at 17. Factoring in an escalation adjustment for inflation over the years, and the unmet costs of asbestos removal, plaintiff now claims that defendant owes the District $21,187,856.68 for the repairs and renovations to Saint Elizabeths pursuant to 24 U.S.C. § 225b(f)(2)(A), (C). Pl.'s Mot. at i.[15]

Payment to the District for the repairs and renovations of the Hospital, once HHS and the District agreed that the District, not HHS, would conduct the work, is clearly mandated by the applicable Transfer Act provision: "The Secretary may enter into an agreement with the Mayor under which the Secretary shall provide funds to the Mayor to complete the repairs and renovations described in subparagraph (A) . . . ." 24 U.S.C. § 225b(f)(2)(C). This provision sets a condition for payment by the United States, a condition which has been met in this case by the agreement between HHS and the District. This language, despite the use of the word "may," is money mandating. *See Doe v. United States,* 100 F.3d 1576, 1580–82 (Fed.Cir.1996) (finding in that case that the word "may" indicated some discretion on the part of the United States, but that entitlement to some payment was nonetheless mandated for those applicants who met the conditions set by the statute). The operative words in this provision of the Transfer Act, once the condition of an agreement had been met, are "shall provide funds . . . to complete the repairs and renovations described." These words clearly command payment by the United States to the District for the

---

15. The court notes that plaintiff's dollar figure for the claims in Count IV has varied over time. *Compare* Compl. ¶ 40 (asserting, as of November 3, 1995, that plaintiff is owed "$60,497,253 . . . and further escalation costs until paid" for Count IV claims) *with* Pl.'s Mot. at i (asserting, as of December 20, 2002, that plaintiff is owed $21,197,856.68 for Count IV claims). The court cites the figure used in plaintiff's motion for summary judgment as the most recent request for relief.

repairs and renovations of Saint Elizabeths. *See Agwiak,* 347 F.3d at 1380 (stating that the use of "shall" pay is generally money mandating). Because the Transfer Act is money mandating for the necessary repairs and renovations of Saint Elizabeths, this court has jurisdiction over plaintiff's claims in Count IV for the allegedly unmet costs of those repairs and renovations.

Defendant argues that *Bowen* precludes this court's jurisdiction over the claims in Count IV of the complaint. This argument has no merit. The District's claims in Count IV amount to the one-time presentation of a bill to bring the transferred facility up to codes and standards. There will be no ongoing relationship between the parties nor will there be an open account to monitor, as there was in the Medicaid disallowance dispute in *Bowen,* 487 U.S. at 904 n. 39, 108 S.Ct. 2722. This court has the capacity to provide a complete and adequate remedy with a monetary judgment. *See id.; see also supra* Section II.A.1. As the Federal Circuit held in *Kanemoto,* when a one-time payment is all that will be required if the plaintiff is eligible for payment under a statute, this court has jurisdiction under the Tucker Act for that plaintiff's claim. 41 F.3d at 646–47.

### 3. Subject Matter Jurisdiction Over Count V

Defendant does not challenge the court's subject matter jurisdiction as to Count V. Count V of the complaint alleges HHS's failure to meet certain contractual requirements embodied in the September 30, 1987 Use Permit entered into by defendant and plaintiff. Pursuant to this agreement, HHS allegedly granted permission to plaintiff to use and occupy most of the West Campus. The term of the Use Permit was from October 1, 1987 through September 30, 1991. Compl. ¶ 43. According to plaintiff, defendant agreed in the Use Permit to reimburse plaintiff for the costs of preserving, maintaining and repairing vacant buildings located on the West Campus.

Count V alleges an express contractual agreement between the United States and plaintiff, which gives this court Tucker Act jurisdiction. "The requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Med. Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997) (citations omitted). All of these elements are alleged to be present here and are undisputed by the parties. The court finds jurisdiction over plaintiff's claims in Count V.

### 4. Subject Matter Jurisdiction Over the Remaining Claim in Count VI

As noted *supra* note 3, the jurisdictional analysis of the claims in Count I applies with equal force here. Count I and Count VI both request payment for mental health services provided to patients allegedly identified by the Transfer Act as patients for whose care the federal government undertakes financial responsibility. Count VI, related to referrals from the Marshals Service, was settled by the parties, except for plaintiff's claim for prejudgment interest. The fact that only a claim for prejudgment interest remains does not affect the court's jurisdiction over Count VI—according to *Fisher,* if the statute itself is money mandating but the relief requested is outside the scope of the statute, this court has jurisdiction and then must proceed to rule on the merits of the claim. 402 F.3d at 1175–76. Therefore, the court retains jurisdiction over the remaining claim for prejudgment interest in Count VI.

### B. Arguments on the Merits

### 1. Count I: Reimbursement For Patient Services

In Count I of the complaint plaintiff seeks payment for defendant's failure to pay for mental health diagnostic and treatment services for patients referred to the Hospital for mental health treatment by the Secret Service pursuant to 24 U.S.C. § 225g(b)(1)(A)-(B). In particular, plaintiff seeks $11,010,262.51 for the cost of providing mental health services to 355 patients that were referred to the Hospital from October 1, 1987 through August 22, 2002. *See* Compl. ¶¶ 10,

12. In support of its motion for summary judgment on Count I, and in response to defendant's motion, plaintiff claims that the purpose of the financing provision is to ensure that local District taxpayers are not unfairly burdened with the expense of treating federal interest mental health patients. In enacting this provision, plaintiff argues, Congress was acknowledging that, due to the unique role of the District as the nation's capital, the federal government has a financial responsibility when it makes referrals to the District for diagnosis and treatment at Saint Elizabeths.

Specifically, plaintiff seeks reimbursement for services provided to the people who were either referred to the District's mental health system "by a responsible Federal agency," 24 U.S.C. § 225g(b)(1)(A), or people who were "referred to the system for emergency detention or involuntary commitment after being taken into custody (i) as a direct result of the individual's action or threat of action against a Federal official, [or] (ii) as a direct result of the individual's action or threat of action on the grounds of the White House or of the Capitol," *id.* § 225g(b)(1)(B), from October 1, 1987 through August 22, 2002. Compl. ¶ 10; Pl.'s Reply at 4. Plaintiff claims that 206 individuals were taken into custody for action or threat of action at the White House; 74 individuals were taken into custody for action or threat of action against Secret Service protectees; 22 individuals were taken into custody at foreign embassies; and that 53 individuals were taken into custody in the exercise of federal responsibilities or as a result of other federal interests during the

time period.[16] Pl.'s Reply at 3. Plaintiff alleges that the majority of patients were taken into custody by the Secret Service, although some of the patients were taken into custody by the United States Park Police or the United States Capitol Police.[17] Pl.'s Facts ¶ 7 n. 1.

Defendant claims that plaintiff is not entitled to the relief sought in Count I because although defendant admits that employees of the Secret Service are believed to have made applications to the District's mental health system for emergency hospitalization of certain persons, plaintiff has not demonstrated that reimbursement for the claimed costs of mental health services is mandated under the Act.

### a. Payment from the Appropriate Federal Agency

The Act states that "the appropriate Federal agency is directed to pay the District of Columbia the full costs for the provision of mental health diagnostic and treatment services for [certain] types of patients." 24 U.S.C. § 225g(b)(1). Defendant argues that the Secret Service is not the "appropriate Federal agency" that should bear the burden for costs for mental health care services, and accordingly, that the Secret Service does not owe plaintiff any money. Plaintiff comes to the opposite conclusion, arguing that "the Secret Service is the 'appropriate federal agency' to pay for the 355 individuals referred to Saint Elizabeths Hospital as a result of a federal interest or in the exercise of federal responsibilities, as required by 24 U.S.C. § 225g(b)(1)." Pl.'s Reply at 2. It is

16. In support of this position, plaintiff gives examples of patients for whom the District presents a claim. For example, one patient appeared at the northwest gate of the White House stating that he was the "son of God" and that God had sent him to speak to the President. Pl.'s App. at 392–93. As a result, the Secret Service agent concluded that this person was mentally ill, and was likely to harm himself or others if not hospitalized. Pl.'s Mot. at 8–9. The agent completed the application for emergency hospitalization and the patient was admitted to the Hospital where he received, according to plaintiff, mental health diagnostic and treatment services for nine days at a cost of $2,790. *Id.* at 9. Plaintiff alleges that this patient was referred to the District's mental health system under the Act as a direct result of his action or threat of action against a

federal official and therefore, the Secret Service is the appropriate federal agency to pay for the costs of treatment. Plaintiff asserts that each patient claimed under Count I was referred to the Hospital by a federal authority as a result of a federal interest or in the exercise of federal responsibilities. Plaintiff claims that the Secret Service "has not paid a cent" to the District since October 1, 1987. *Id.* at 13.

17. Exhibits 2 through 5 of plaintiff's supplemental appendix list patients taken into custody and referred to the District's mental health system, but plaintiff does not identify which entity, among the Secret Service, the Park Police and the Capitol Police, made each referral.

**322**

appropriate at this juncture to note that the defendant in this case is the United States, and the issue of whether or not the Secret Service is the appropriate federal agency to pay the District is not dispositive of plaintiff's claims in Count I.

It is regrettable that the statute does not clearly define which federal agency is the appropriate one to pay the District, but for the purposes of determining liability, it is only necessary, and this court's sole mission, is to determine whether the United States must pay the District for its claims in Count I. Once liability has been established, if there is an unpaid liability of the United States, the parties are encouraged to settle on the amount due for the claims in Count I. Even if the court is eventually asked to intervene to determine the amount of a money judgment for plaintiff's claims in Count I, there is no requirement for this court to identify which federal agency or agencies bear the fiscal responsibility for that judgment entered against the United States. The court refrains from commenting on which federal agency is the "appropriate" one, because such commentary would be pure dicta.

### b. Referral by a Responsible Federal Agency

The Act requires reimbursement from the United States for mental health diagnostic and treatment services when a "responsible Federal agency" has referred a patient to the District's mental health system. 24 U.S.C. § 225g(b)(1)(A). The term "responsible Federal agency" is not defined in the statute. Plaintiff does not categorically assert that the Secret Service qualifies as a responsible federal agency, but instead asserts that the Secret Service is *either* the responsible *or* the appropriate federal agency under the statute, and that in any case, the Secret Service should pay the District for all referrals under section 225g(b)(1)(A) (stating that services pursuant to referrals by a responsible federal agency should be reimbursed) and section 225g(b)(1)(B)(i)-(ii) (stating that services pursuant to referrals for emergency detention or involuntary commitment under certain circumstances should be reimbursed). Pl.'s Mot. at 7–8. Defendant, on the other

hand, argues that the Secret Service is not a "responsible Federal agency" under section 225g(b)(1)(A). Def.'s Mot. at 14. The court disagrees with defendant, and finds that the Secret Service is a "responsible Federal agency" pursuant to section 225g(b)(1)(A).

■ The court begins with the language of the statute. When interpreting statutory language, the court's analysis always begins with the plain language of the statute, and then moves on to other extrinsic aids, such as legislative history, rules of statutory construction, and the construction placed on the statute by the agency which administers it; the ultimate objective being to discern, if possible, the intent of Congress. *Johns–Manville Corp. v. United States*, 855 F.2d 1556, 1559 (Fed.Cir.1988) (citations omitted). But, " '[w]here the language is plain and admits of no more than one meaning[,] the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion.' " *Henry v. United States*, 793 F.2d 289, 293 (Fed.Cir.1986) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1916)).

These tenets are pertinent for the interpretation of an undefined term appearing in a statute. A court first looks to the plain meaning of the words used. *Cassman v. United States*, 31 Fed.Cl. 121, 125 (1994). "When further guidance as to the meaning of a word is needed, the court may then consult the legislative history of the statute." *Id.* "When the legislative history does not reveal the appropriate meaning, it is helpful to resort to dictionaries to apply the common meaning of the term." *Id.* (citing *Reese v. United States*, 28 Fed.Cl. 702, 706 (1993); *Ashland Oil, Inc. v. Comm'r*, 95 T.C. 348, 356–57, 1990 WL 139423 (1990)). The goal of statutory construction is to discover the intent of Congress. *Williams v. United States*, 240 F.3d 1019, 1039 (Fed.Cir.2001) (noting that "[o]rdinary canons of statutory construction [are] designed for application to reveal the intent of Congress").

■ First, the court must decide whether or not the Secret Service is an agency. The United States Secret Service was part of the Department of the Treasury until late 2002, at which time it became part of the newly

created Department of Homeland Security.[18] *See, e.g.,* Pub.L. No. 107–296, Title XVII, § 1703(a)(1), 116 Stat. 2313 (2002) (codified at 18 U.S.C. § 3056). Under Title V of the United States Code which describes the organization of the federal government, the Department of the Treasury is defined as an "Executive department." 5 U.S.C. § 101. Because it is an executive department, the Department of the Treasury is also an "Executive agency." *Id.* § 105. In various sections of Title V, "executive agency" and "agency" are defined to be synonymous terms. *See, e.g.,* 5 U.S.C. §§ 302, 902, 5721. Divisions of an executive agency are also referred to as agencies, and have been for some time. *See, e.g.,* 5 U.S.C. § 551 (stating that "[f]or the purpose of this subchapter ... 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency"); § 902 (stating that "[f]or the purpose of this chapter ... 'agency' means ... an Executive agency or part thereof"); Reorganization Act of 1949, Pub.L. No. 81–109, § 7, 63 Stat. 203, 205 (1949) (defining "agency" to refer to, among other entities, a division or authority in the executive branch of the federal government). Because a part of an executive department is for many purposes defined to be an agency by Title V of the United States Code, the court concludes that the term "agency," as used in the Transfer Act, includes a part of an executive department such as the Secret Service.

The common meaning of the word "agency" supports the court's interpretation of that term within the Transfer Act. The word agency is commonly used when referring to the Secret Service. The Secret Service is considered a federal law enforcement agency for border security and protection. *See* 8 U.S.C. § 1701(4). The Secret Service is referred to as an agency that was transferred

from the Department of the Treasury to the Department of Homeland Security. *See* Department of Homeland Security, Office of the Secretary, 69 Fed.Reg. 73,186 (Dec. 13, 2004). The Secret Service is now defined as an agency under the Department of Homeland Security. *See* Black's Law Dictionary 1571 (8th ed. 2004) ("A law enforcement agency in the U.S. Department of Homeland Security responsible for providing security for the President, Vice President, certain other government officials, and visiting foreign diplomats, and for protecting U.S. currency by enforcing the laws relating to counterfeiting, forgery and credit-card fraud."). It is logical to presume that the drafters of the Transfer Act would have considered the Secret Service to be a federal agency as well.[19]

■ Next, the court must address whether the Secret Service is a "responsible Federal agency" under the Act. *See* 24 U.S.C. § 225g(b)(1)(A). This term is also undefined by the Transfer Act. Defendant valiantly tries to prove that Congress did not intend the Secret Service to be among those federal agencies that could be considered responsible for referrals to the District's mental health system under section 225g(b)(1)(A), but these arguments are strained and of no avail. For instance, defendant argues that because some of the referrals by the Secret Service were done in the course of "offer[ing] neighborly assistance to the Metropolitan Police" of the District, these referrals do not indicate responsibility on the part of the Secret Service for payment. Def.'s Mot. at 15. This argument conflates the idea of responsibility for payment, a concept found in section 225g(b)(1), with the definition of a responsible federal agency as a referral source, a concept found in section 225g(b)(1)(A).

18. The court analyzes the "agency" issue as it pertains to the Secret Service as part of the Department of the Treasury, as it was for all of the years for which reimbursement related to Secret Service referrals to Saint Elizabeths is claimed in Count I. The same analysis would apply to the Secret Service as part of the Department of Homeland Security, which, like the Department of the Treasury, is an executive department. *See* 6 U.S.C.A. § 111 (Supp. I 2005).

19. Once an entity has been defined to be an agency, if that agency is part of the federal government, the term "federal agency" should logically be applied in most instances, and is used in that fashion in Title V. *See* 5 U.S.C. § 804 (2000) (stating that "[f]or purposes of this chapter ... [t]he term 'Federal agency' means any agency as that term is defined in section 551(1)").

As discussed more fully *infra* in Section II.B.1.c., subsections (A), (B) and (C) of section 225g(b)(1) list categories of referrals that mandate reimbursement by "the appropriate Federal agency." 24 U.S.C. § 225g(b)(1). Thus, in this statutory context, the adjective for the federal agency that will pay the District is "appropriate." Although the adjective "responsible" also has, in some contexts, a meaning of liability for payment, in others it means the state of being obligated to perform a role or duty. *See* Webster's Third New International Dictionary 1935 (2002) (stating that "*responsible* may differ from *answerable* and *accountable* in centering attention on a formal organizational role, function, duty or trust"). The only logical interpretation of the word "responsible" in 225g(b)(1)(A), given the other language of the statute and the structure of the list of referral categories, is that "responsible" acts as an adjective modifying the entire class of federal agencies, so that "responsible" restricts the scope of the statutory provision in 225g(b)(1)(A) to those agencies which have a responsibility, as part of their mission, to refer individuals to the District's mental health system. The Secret Service meets this definition because of its role and duties in the nation's capital; many other federal agencies would not.

The Secret Service "protects the President and Vice President of the United States and their immediate families; the White House; the Vice President's residence; major Presidential and Vice Presidential candidates; former Presidents, their spouses, and their minor children; foreign diplomatic missions located in the metropolitan area of the District of Columbia; and foreign heads of state visiting the United States." Def.'s Mot. at 15. Furthermore, "[w]hen directed by the President, the [Secret Service] is authorized pursuant to 18 U.S.C. § 3056(3) to assist in security operations at special events of national significance." *Id.* These core responsibilities require the Secret Service to respond, on an as-needed basis, to the threatening behavior of persons exhibiting the symptoms of mental illness. The Secret Service's response to these volatile situations must, of necessity, include the option of referring these individuals to the District's

mental health services system for diagnostic and treatment services. Therefore, pursuant to the Transfer Act provision codified at 24 U.S.C. § 225g(b)(1)(A), the Secret Service is a prime example of a "responsible Federal agency."

Another of defendant's principal arguments against including the Secret Service in the category of responsible federal agencies is that "there is no federal statute or regulation that identifies the Secret Service as an appropriate or responsible federal agency for such referrals." Def.'s Reply at 15. It is true that the Transfer Act does not so identify the Secret Service in particular, and there is no regulation on this topic. But that is because "responsible Federal agency" is nowhere precisely defined—it is not as if the Secret Service had been left off a list found elsewhere in the statute. Following defendant's logic to its ultimate conclusion, the statutory provision concerning referrals from "responsible Federal agenc[ies]" would be surplusage and have no meaning, because the statute neglected to list these agencies. The court must interpret the Transfer Act so as to give meaning to all of its provisions. *See Horner v. Merit Sys. Prot. Bd.*, 815 F.2d 668, 674 (Fed.Cir.1987) ("It is a well-established rule of statutory interpretation that a statute should not be interpreted so as to render one part inoperative.") (citing *Colautti v. Franklin*, 439 U.S. 379, 392, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979)). The fact that the Secret Service is not specifically listed as a responsible federal agency does not mean that it cannot be a responsible federal agency for purposes of the Transfer Act.

The legislative history of the Act shows that Congress, in an effort to facilitate the transition of the Hospital from HHS to the District, intended that the District be responsible for the cost and care of mental health patients who are simply District residents, but that the federal government should bear the cost of patients referred to the system under federal auspices; for example, under national programs or as a result of federal agencies protecting the seat of government. *See* H.R.Rep. No. 98–1024, at 15 (1984) (stating that section 225g(b) "authorizes the head of the appropriate federal agency to pay the

District the full costs of mental health care provided to so-called Federal mental health case individuals"); *see also Followup Hearings on District of Columbia Appropriations for Fiscal Year 1984: Hearing Before the Subcommittee of the Committee on Appropriations, United States Senate*, 98th Cong. 68 (1984) (statement of Gladys W. Mack, Director, Office of Policy and Program Evaluation, Executive Office of the Mayor of the District of Columbia) (stating that patients at the Hospital include beneficiaries of the VA, the U.S. Soldiers Home, and the Public Health Services; residents of the District; non-residents of the District found to be mentally ill while in the District; mentally ill persons charged with or convicted of crimes in the District; patients committed under court order by federal courts outside the District; those found not guilty by reason of insanity in federal courts; citizens of the United States without state residence who become mentally ill while abroad; and patients who participate in a national program for the deaf); *id* at 75 (statement by Ms. Reveal, a "colleague" of Ms. Gladys Mack, suggesting that, although the Hospital would be under District control, the federal government should be responsible for funding national programs, for example, for "people who are drawn to the District by virtue of the presence of elected and appointed officials who they want to contact and in some way interact with ... [because] that burden should be shared nationally"); *id.* at 95 (statement of Alice T. Dodge, A.C.S.W.) ("It should be obvious that the D.C. Government would not be able ... to pick up the total cost of care of [Saint Elizabeths] patients ... [l]et alone carry out the necessary planning and financing to provide resources for them in the community.").

With respect to patients referred to the Hospital by the Secret Service, it is clear, based on the legislative history of the Act in conjunction with the plain wording of section 225g, that the federal government, and not the District, should be the entity covering the costs of those patients' treatment in the District's mental health system. The types of patients referred to the system by the Secret

Service are patients for whom the United States meant to shoulder the cost of care under the Act, while the District was to focus on patients of local concern. Thus, the court finds that the Secret Service is a "responsible Federal agency" for the purpose of section 225g(b). Accordingly, the court finds defendant liable under the Act for the costs of those patients referred to the District's mental health system by the Secret Service.[20]

■ Plaintiff also states that although the vast majority of the patients referred to the District's mental health system were referred by Secret Service personnel, some of the patients were referred to the system by the United States Park Police (Park Police) and the United States Capitol Police (Capitol Police). Pl.'s Mot. at 14 n. 9. With respect to the Park Police, the court finds that the Park Police is a federal agency, but not a responsible federal agency for the purposes of section 225g(b)(1)(A). The Capitol Police is not a federal agency and therefore it cannot be a responsible federal agency for the purposes of section 225g(b)(1)(A).

The National Park Service is a component of the Department of the Interior. 16 U.S.C. § 1 (2000); *see also* Pub.L. No. 64–235, § 1, 39 Stat. 535 (1916) (creating the National Park Service as a service under the Department of the Interior). Park Police officers are employees of the National Park Service authorized to make arrests and conduct investigations, and maintain law and order within the National Park system. 16 U.S.C. § 1a–6(b). The United States Park Police has also been referred to as a "sub-agency" of the Department of the Interior. *See Saffron v. Wilson*, 481 F.Supp. 228, 232 (D.D.C. 1979).

Under Title V of the United States Code which describes the organization of the federal government, the Department of the Interior is defined as an "Executive department." 5 U.S.C. § 101. Because it is an executive department, the Department of the Interior is also an "Executive agency." *Id.* § 105. Thus, for the same reasons that the court finds the Secret Service to be a federal

**20.** Defendant's third argument against the court's finding of liability under section 225g(b)(1)(A) is discussed *infra* in Section II. B.1.c.

agency, the Park Police is also a federal agency. But it is only by examining the mission of the Park Police that the court can discern whether the Park Police is a responsible federal agency under section 225g(b)(1)(A).

The United States Park Police has a law enforcement mission that greatly resembles the mission of the District's Metropolitan Police, except that the Park Police officers focus primarily upon federal property. *See* D.C.Code Ann. § 5–201 ("The watchmen provided by the United States government for service in any of the public squares and reservations in the District of Columbia shall, after August 5, 1882, be known as the 'United States Park Police.' They shall have and perform the same powers and duties as the Metropolitan Police of the District."); United States Department of Interior, National Park Service, United States Park Police, *History, at* http:// www.nps.gov/uspp/authistpag.htm (last visited August 11, 2005) ("The [Park Police] provides highly trained and professional police officers to prevent and detect criminal activity, conduct investigations, apprehend individuals suspected of committing offenses against Federal, State and local laws, ... [and,] [s]ince [1882], the duties of the U.S. Park Police have been synonymous with that of an urban police department."). Although Park Police officers are "frequently requested to provide protection for dignitaries, such as the President of the United States and visiting foreign heads of state," United States Park Police, *History, at* http://www.nps.gov/uspp/authistpag.htm, this urban police force has a much broader mission "[t]o provide highly trained and professional police officers to prevent, investigate and detect criminal activity, and to apprehend violators of rules, regulations and laws, and provide assistance of a non-enforcement nature within designated areas of the National Park Service," United States Park Police, *Mission and Value Statement, at* http://www.nps.gov/uspp/mission.htm. Although the Park Police is a federal agency, the mission of this urban police force based in metropolitan Washington, D.C.,[21] unlike the mission of the Secret Service, is less to protect the high-profile leadership of the nation's government than to maintain law and order over broad tracts of federal property in the District of Columbia, Virginia and Maryland. *See* D.C.Code Ann. §§ 5–201, 5–206, 5–208 (enumerating enforcement powers of the Park Police in the District of Columbia, in five counties and the City of Alexandria in Virginia, as well as in four counties in Maryland).

The urban police duties of the Park Police include executing search warrants in private homes, going undercover to make drug arrests and conducting traffic stops. *See, e.g., Bolden v. United States,* 835 A.2d 532, 534 (D.C.2003) (upholding conviction based on evidence gathered by Park Police officers while executing a search warrant at a private residence in the District); *Robinson v. United States,* 756 A.2d 448, 451 (D.C.2000) (upholding convictions based on evidence gathered by Park Police officers involved in an undercover drug operation on the streets of the District); *Russell v. United States,* 687 A.2d 213, 213, 215 (D.C.1997) (upholding a conviction based on evidence gathered during a traffic stop triggered by an expired Virginia inspection sticker on a Virginia-registered car driven in the District). These examples of law enforcement activities show that the duties of the Park Police are broad and these examples also indicate that by no means all or even most of Park Police encounters with individuals with mental illness would be encounters with "federal interest" mental health patients. For this reason, the court finds that the Park Police is not a "responsible Federal agency" for the purposes of section 225g(b)(1)(A).

■■■ Unlike the Secret Service and the Park Police, the Capitol Police does not fall under any executive department. The Capitol Police is an entity created by Congress and overseen by the Capitol Police Board, which consists of the Sergeant of Arms of the United States Senate, the Sergeant of Arms of the House of Representatives, and the Architect of the Capitol. *See* 2 U.S.C. §§ 1901, 1961. The duties of the Capitol

---

**21.** There are also units of the Park Police based in San Francisco and New York City. United States Park Police, *History, at* http:// www.nps.gov/uspp/ authistpag.htm.

Police are to police, patrol and monitor the Capitol buildings and grounds. *Id.* § 1961. Capitol Police officers have the power to make arrests within the United States Capitol buildings and grounds for violations of the laws of the United States, the District of Columbia or any other state. *Id.* In addition, Capitol Police officers have the power to make arrests in the District for crimes of violence committed in the presence of any member of the Capitol Police performing official duties. *Id.*

Because the Capitol Police is part of the legislative branch and is not part of the executive branch, the court cannot conclude that the intent of Congress was to include the Capitol Police in the category of entities referred to as federal agencies. In several sections of Title V of the United States Code, the Capitol Police would be excluded by the definition of an "agency." *See, e.g.,* 5 U.S.C. §§ 302, 551(1)(A), 804, 902, 5721. Accordingly, inasmuch as the Capitol Police cannot be considered a federal agency in the first instance, the Capitol Police cannot be properly characterized as a "responsible Federal agency" under the Transfer Act. Thus, any referrals from the Capitol Police to Saint Elizabeths do not fall within section 225g(b)(1)(A).

 Referrals from the Capitol Police or the Park Police may, however, fall within sections 225g(b)(1)(B)(i), 225g(b)(1)(B)(ii) or 225g(b)(1)(B)(iii): "Any individual referred to the [District's mental health] system for emergency detention or involuntary commitment after being taken into custody (i) as a direct result of the individual's action or threat of action against a Federal official, (ii) as a direct result of the individual's action or threat of action on the grounds of the White House or of the Capitol, or (iii) under chapter 9 of Title 21 of the District of Columbia Code [allowing referrals to Saint Elizabeths of individuals apprehended on federal property in nearby Virginia or Maryland]." 24 U.S.C. § 225g(b)(1)(B). Although the District may not rely on section 225g(b)(1)(A) in seeking reimbursement for referrals from the Capitol Police or the Park Police, sections 225g(b)(1)(B)(i)-(iii) clearly manifest the intent of Congress to pay for the mental health care for people who have threatened federal officials or who are taken into custody under the conditions and in the geographic areas specified by sections 225g(b)(1)(B)(ii)-(iii) and who are then referred to the District for emergency detention or involuntary commitment. This statutory commitment to payment places more preconditions on these referrals than the broader liability imposed by 225g(b)(1)(A), but reimbursement for these referrals nonetheless addresses the concerns of the drafters of the Transfer Act. Accordingly, the court finds defendant liable for those patients referred to the District's mental health system by the Capitol Police or the Park Police when those referrals meet the conditions set by any of sections 225g(b)(1)(B)(i), 225g(b)(1)(B)(ii) and 225g(b)(1)(B)(iii).

### c. Scope of Defendant's Liability for Reimbursement

 Because the court finds that the Secret Service is a "responsible Federal agency" under 24 U.S.C. § 225g(b)(1)(A), the court need not address whether the patients referred to District's mental health system by the Secret Service also fall under section 225g(b)(1)(B) which covers patients who took action against or made threats of action against federal officials, or whose actions or threats of action were made on the grounds of the White House (or the Capitol) or who were apprehended on federal lands in nearby Virginia and Maryland. 24 U.S.C. § 225g(b)(1)(B)(i)-(iii). Despite the parties' extensive briefing on what constitutes a "Federal official" and the meaning of the term "on the grounds of the White House," the court need not make this determination for the purpose of determining the liability for reimbursement related to referrals by the Secret Service, a "responsible Federal agency" under section 225g(b)(1)(A). Instead, the government's liability for payment is fixed by § 225g(b)(1)(A) for any referrals made by the Secret Service to Saint Elizabeths.

Defendant reads the Transfer Act too narrowly in this regard. Defendant argues that Congress could not have intended the Secret Service to be included in section 225g(b)(1)(A) as a responsible federal agency

making referrals to the District's mental health system when, at the same time, the Secret Service's role as a referral source is described accurately and completely in section 225g(b)(1)(B)(i)-(ii). *See* Def.'s Mot. at 5–6 (stating that plaintiff's reading of the statute would find Secret Service referrals included in both section 225g(b)(1)(A) and section 225g(b)(1)(B) and that this broad reading would make section 225g(b)(1)(B) superfluous); Def.'s Reply at 16 (stating that "[i]f plaintiff's reading of [section] 225g(b)(1)(A) is correct, it would render [section] 225g(b)(1)(B) superfluous because it[, section 225g(b)(1)(B),] would be unnecessary to identify more specific areas of responsibility [of the Secret Service]"). Defendant offers its own statutory interpretation of these sections, concluding:

> As specifically set forth in subsections 225g(b)(1)(B)(i) and (ii), there are only carefully delineated categories of individuals for which a federal agency can be found to be responsible subsequent to a referral for emergency detention or involuntary commitment: an individual referred as a direct result of an action or threat of action against a federal official ..., or an individual referred as a direct result of an action or threat of action on the grounds of the White House. In specifically identifying only these categories of individuals referred for emergency detention or involuntary commitment, Congress intended to not hold federal agencies responsible for other individuals referred for emergency detention or involuntary commitment.

Def.'s Mot. at 16 n. 10. Defendant's statutory interpretation cannot be correct, because it ignores the multiple qualifying possibilities for federal reimbursement listed in the Transfer Act, and because defendant's interpretation would make section 225g(b)(1)(A) superfluous.

The plain language and structure of the Act support another reading. In section 225g(b)(1)(A), the United States commits to paying for the care of two categories of federal interest mental health patients: those specifically designated by any federal statute and those referred by a responsible federal agency, such as, *see supra*, the Secret Service. In section 225g(b)(1)(B), the United States commits to paying for the care of three categories of federal interest mental health patients who are defined not by a referral source, (which might be, or might not be, a responsible federal agency mentioned in section 225g(b)(1)(A)), but by the acts of these individuals or the locations where their acts have been committed. Thus, in section 225g(b)(1)(B)(i), threats and actions against federal officials are a qualifying category for federal reimbursement of mental health care by the District; in section 225g(b)(1)(B)(ii), threats or actions on the grounds of the White House or on the grounds of the Capitol are a qualifying category for federal reimbursement; and in section 225g(b)(1)(B)(iii), "Mentally Ill Persons Found in Certain Federal Reservations" in neighboring Virginia and Maryland, as defined by Chapter 9 of Title 21 of the District's Official Code,[22] are also a qualifying category for federal reimbursement for the care they receive from the District's mental health system. And finally, section 225g(b)(1)(C) lists yet another qualifying category not at issue in the parties' cross-motions, referrals that arise in federal court criminal proceedings.

Although there may be some overlap in these qualifying categories, none of the categories are superfluous. Take, for example, the case of a non-resident mentally ill individual who visits the District, because she is drawn to the nerve center of national government. Her entry into the District's mental health system for diagnosis and treatment is intended by Congress to not burden the District's budget. If she is apprehended by the Secret Service on the grounds of the White House after yelling that she is going to kill the President, and she is then transported to Saint Elizabeths, several provisions of the Transfer Act, sections 225g(b)(1)(A), 225g(b)(1)(B)(i), and 225g(b)(1)(B)(ii) all apply and mandate reimbursement from the United States for her mental health services.

---

**22.** Another area included as an appropriate referral catchment area is Saint Elizabeths hospital itself. D.C.Code Ann. § 21–902 (2001).

Yet, if the Secret Service stops the same woman from blowing herself up in Lafayette Park, this referral would only be reimbursable pursuant to section 225g(b)(1)(A). If a Metropolitan Police officer arrests the same woman carrying a burning torch down Pennsylvania Avenue toward the White House while threatening to burn it down and kill the President, this referral is only covered by section 225g(b)(1)(B)(i). And if a Park Police officer arrests the same woman as she silently scales the White House fence, this referral to Saint Elizabeths is only covered by section 225g(b)(1)(B)(ii). These scenarios illustrate that sections 225g(b)(1)(A), 225g(b)(1)(B)(i) and 225g(b)(1)(B)(ii) are all necessary to carry out the intent of Congress, to enable this "federal interest" mental health patient to get the mental health care she needs without overburdening the District's budget.

For referrals from the Capitol Police and Park Police, there are three terms which are undefined in the Transfer Act that limit the extent of defendant's liability for reimbursement of mental health services. The first is "Federal official," as a target of action or threats of action. 24 U.S.C. § 225g(b)(1)(B)(i). The parties have not briefed their positions on the meaning of this term as it relates to referrals from the Capitol Police and Park Police, although their briefs do consider the question in the context of Secret Service referrals. In that context, the parties appear to have contemplated that "Federal official" would include high-level federal office-holders such as the President and Vice-President who are protected by the Secret Service. See Pl.'s Reply at 10 n. 6 ("There is no need to address whether this term [Federal official] includes 'any United States employee[,]' as *all* of the individuals for whom the District is making a claim under 24 U.S.C. § 225g(b)(1)(B)(i) are persons who the Secret Service is responsible for protecting under 18 U.S.C. § 3056.") (quoting Def.'s Mot. at 6); Def.'s Reply at 17 ("As it relates to the Secret Service's responsibility, the term 'Federal official' as used in section 225g(b)(1)(B)(i) applies only to those individuals the Secret Service is charged with protecting pursuant to 18 U.S.C. § 3056."). Because this term may not be the subject of controversy as it relates to the small number

of referrals from the Capitol Police and Park Police, the court is hesitant to add a gloss to the plain meaning of the term "Federal official." In the interests of providing some level of guidance, however, although the court does not fix the exact parameters of the term "Federal official" under the Transfer Act, such a term would certainly include, at the very least, highly visible representatives of the sovereign, such as the President, Vice-President, cabinet members, members of Congress, and Supreme Court justices.

The second undefined term limiting defendant's liability for referrals from the Capitol Police and the Park Police is "on the grounds of the White House," 24 U.S.C. § 225g(b)(1)(B)(ii), as the locus of actions or threats of action prompting the taking of individuals into custody. The parties vigorously debate the geographic boundaries of the grounds of the White House. See Def.'s Mot. at 7–8 ("[N]ot even those individuals arrested at the gate of the White House fall within the terms of the Transfer Act. Rather it is only those individuals who have trespassed onto the White House grounds by methods such as attempting to climb the White House fence, attempting to rush through the White House gate, throwing objects onto the White House grounds, or handcuffing themselves to the White House fence, who would fall within the purview of the statute."); *id.* at 19 (stating that "the phrase 'on the grounds of the White House' refers only to the area within the perimeter of the fence around the White House"); Pl.'s Reply at 4 ("Defendant's argument fails to recognize that, unlike your typical private home, the security needs of the White House extend well beyond its fence ...."). Plaintiff argues, persuasively, that the intent of Congress would be thwarted if the large number of "federal interest mental health patients" apprehended just outside the White House fence and referred to Saint Elizabeths for threatening some action within the fence were not covered by section 225g(b)(1)(B)(ii).

Indeed, the language of section 225g(b)(1)(B)(ii) manifests this intent of Congress. It is not only "action" on the grounds of the White House that creates a qualifying

**330**

category of individuals for the federal reimbursement of mental health services provided by the District, but also the "threat of action on the grounds of the White House." Such a threat can easily be posed from the sidewalk along the fence bordering the White House lawn. Indeed, "threat of action" would become mere surplusage if the threat had to occur while the individual had already trespassed and gained access to the White House lawn, because at that point the person's trespass has already created an "action." Because the statute and the intent of Congress are concordant on this issue, the court finds that at least the White House sidewalk is encompassed by the language of "threat of action on the grounds of the White House," 24 U.S.C. § 225g(b)(1)(B)(ii), and that the mental health services provided to the individuals taken into custody on that sidewalk and referred to Saint Elizabeths are reimbursable under the Transfer Act. As to the exact limits of the areas proximate to the grounds of the White House for the purposes of section 225g(b)(1)(B)(ii), the court finds that these areas are those where the security of the White House is potentially threatened by individuals climbing up, rushing toward, throwing objects over or handcuffing themselves to the fence or gates. *See* Def.'s Mot. at 7–8.

The third term undefined by the Transfer Act limiting defendant's liability for referrals from the Capitol Police and the Park Police is "on the grounds of . . . the Capitol," 24 U.S.C. § 225g(b)(1)(B)(ii), as the locus of actions or threats of action prompting the taking of individuals into custody. The parties have not briefed their positions on the definition of this term, and this term may not be in controversy. In any case, the area referred to as the "United States Capitol Grounds" has been defined by statute, 40 U.S.C. § 5102 (2000), and this definition delimits the area of the grounds of the Capitol as used in 24 U.S.C. § 225g(b)(1)(B)(ii). The grounds of the Capitol include approximately 274 acres of "buildings . . . [and] lawns, walkways, streets, drives, and planting areas," contained in contiguous and non-contiguous parcels radiating out from the United States Capitol. *See* Architect of the Capitol, *Grounds, at* http://www.aoc.gov/ cc/grounds/index.cfm (last visited Aug. 11, 2005); *see also* Architect of the Capitol, *Map of the Capitol Grounds, at* http://www.aoc. gov/cc/grounds/cc_map_grounds.cfm.

### d. "Full Costs for the Provision of Mental Health Diagnostic and Treatment Services"

Although the United States is liable for the "full costs" of the mental health services provided by the District to individuals whose referrals qualify for reimbursement under 24 U.S.C. § 225g(b)(1), defendant attempts to reduce those reimbursable costs by narrowly interpreting the Transfer Act to limit those costs to the forty-eight hour period following each referral. *See* Def.'s Mot. at 24 (stating that the Secret Service "can only be found to be responsible for payment of mental health diagnostic and treatment services provided to individuals it referred . . . for the first 48 hours of the person's detention"). This interpretation is not plausible nor correct. Defendant's argument is premised on this court finding liability for referrals only under 24 U.S.C. § 225g(b)(1)(B)(i)-(ii). For the Secret Service, however, the court has found liability under 24 U.S.C. § 225g(b)(1)(A). None of the language in section 225g(b)(1)(A) could be interpreted as limiting "the full costs" for services to the full costs of only the first forty-eight hours of services.

Indeed, it would be illogical for there to be language in the Act to limit reimbursement to only forty-eight hours' worth of treatment when clearly there is no language which limits the treatment of qualifying patients under the Transfer Act to merely some fraction of that which mental health experts at the Hospital deem necessary. The purpose and intent of the statute is spelled out in the letter of the law as well as in the legislative history of the Act, which explicitly states that the federal government is to shoulder the full expenses of "federal interest" mental health patients, as identified under the Transfer Act. There is no limiting language to support the government's assertion that only some fraction of those expenses should be covered. In the face of statutory language which clear-

██ **331**

ly obligates defendant to pay for the treatment expenses of "federal interest" patients, defendant proffers the argument that once a qualifying mental health patient is taken in and preliminarily diagnosed or treated, all responsibility of the federal government abruptly ceases after two days, irrespective of whether that individual remains, perhaps, dangerously mentally ill and in need of extensive treatment. To give credence to defendant's argument that only the first forty-eight hours of treatment is covered by the Act is to impose a strained and unreasonable interpretation upon the provisions of the Act in contravention of both the letter and spirit of the statute. *See In re Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978) (stating that the Supreme "Court, in interpreting the words of a statute, has 'some "scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results ... or would thwart the obvious purpose of the statute" ... [b]ut it is otherwise "where no such consequences would follow and where ... it appears to be consonant with the purposes of the Act ...."'" (citing *Comm'r v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965))).

Even where liability for referrals to Saint Elizabeths is, in the case of referrals from the Capitol Police and Park Police, only found in 24 U.S.C. § 225g(b)(1)(B)(i)-(iii), the context of these statutory provisions militates against an interpretation limiting reimbursement liability to services provided within forty-eight hours. The portion of the Transfer Act dealing with *payment* by the United States is not modified or limited but simply refers to "the full costs for the provision of mental health diagnostic and treatment services for the following types of patients." 24 U.S.C. § 225g(b)(1). In contrast, the portions of the Act describing the *qualifying categories* of referrals limits the qualifying referrals in sections 225g(b)(1)(B)(i)-(iii) to those "for emergency detention or involuntary commitment." Relying on this language, defendant imports various code provisions of the District of Columbia Code to explicate the circumstances of emergency detention and involuntary commitment and to interpret these as setting time period limitations on defendant's reimbursement liability. Def.'s Mot. at 20–27. None of this interpretation is pertinent however, because the language in section 225g(b)(1)(B)(i)-(iii) describes *qualifying referrals* in a list of qualifying categories of referrals, and cannot be read to be descriptive of limitations on the period of time for which the United States will be liable for the costs of treatment of those patients. *See supra* discussion of the language and structure of 24 U.S.C. § 225g(b)(1) in Section II.B.1.c. of this opinion. The court finds that the language of 24 U.S.C. § 225g(b)(1)(B)(i)-(iii) does not limit the liability of the United States to the first forty-eight hours of diagnosis and treatment for persons referred by the Capitol Police and Park Police, and would not so limit the liability of defendant for reimbursement related to referrals of the Secret Service, should this court have erred in finding liability for these referrals under 24 U.S.C. § 225g(b)(1)(A).

██ Finally, defendant contests the billing rate the District claims for mental health services at Saint Elizabeths. Plaintiff asserts that the District has claimed the full costs of mental health services at "the billing rates approved by the United States, through its Medicare Fiscal Intermediary." Pl.'s Mot. at 13 n. 7. Plaintiff describes the inpatient billing rate as an "all-inclusive rate [that] includes room and board, and physician and ancillary services." Pl.'s Reply at 27. The outpatient billing rate is also described as all-inclusive. *Id.* at 27 n. 20. Plaintiff asserts that the billing rates claimed in this lawsuit "reflect[ ] the reasonable and actual costs of services, as determined by the United States, through [the Centers for Medicare and Medicaid Services]." *Id.* at 27. According to plaintiff, the United States itself charged these all-inclusive rates, as regulated by the Medicare Fiscal Intermediary, when it operated Saint Elizabeths.[23] *Id.*

23. Plaintiff provides a summation of rates for inpatient mental health care services at the Hospital for various time periods. Pl.'s Facts ¶ 9. According to plaintiff, from October 1, 1987 until

Defendant apparently would prefer an itemized breakdown of actual costs per patient. Def.'s Mot. at 28 (stating that "it is incumbent on plaintiff to present evidence as to what its actual cost was providing these services to these patients"). The court does not concur. The United States has sanctioned the Medicare rates that the District is using for billing rates in this lawsuit, both as payor for Medicare beneficiaries, and as service provider when it operated Saint Elizabeths. The United States Marshals Service agreed to pay the Interim Medicare rate for its referrals to Saint Elizabeths in the mid–1990s. Pl.'s Supp.App. at 49. Undisputed by defendant is plaintiff's assertion that the Medicare all-inclusive rate system has been the basis of billing at Saint Elizabeths "since at least 1971 for inpatients and since 1982 for outpatients." Pl.'s Reply at 27. Defendant has offered no more than a cursory criticism of the claimed billing rates for mental health services provided by the District, and the court will not disturb a rate-setting system that adequately captures the "full costs" for these services that must be reimbursed pursuant to the Transfer Act. Defendant may, of course, contest the accuracy of plaintiff's rec-

ords and the calculations providing the total amounts claimed by plaintiff based on these billing rates, if the parties cannot agree to a settlement amount for the claims in Count I of the complaint.[24]

For these reasons, the court grants in part plaintiff's motion for summary judgment on Count I, finding the United States liable for reimbursing the full costs of mental health services for all individuals referred by the Secret Service, as well as those referrals by the Park Police and Capitol Police to Saint Elizabeths which meet the qualifying criteria described *supra.* Defendant's liability for reimbursement is not limited to the first forty-eight hours of treatment. The mental health services provided by the District shall be reimbursed at rates established by the Medicare rate for the relevant services. The issue of quantum for Count I is stayed. The court denies defendant's motion for partial summary judgment as to Count I.

## 2. Count IV: Costs to Repair and Renovate the Hospital

For Count IV of the complaint, plaintiff now seeks to recover roughly $21 million for

September 30, 1989, the rate established for inpatient mental health services at the Hospital was $225.71 per day. From October 1, 1989 until September 30, 1990, the established rate was $280 per day; from October 1, 1990 to September 30, 1992, the established rate was $310 per day; from October 1, 1992 to January 31, 1995, the established rate was $450 per day; from February 1995 to August 2002, the established rate was $425 per day. With the exception of the period between October 1, 1992 to January 31, 1995, the established rates were also the interim rates approved by the Medicare Fiscal Intermediary, on behalf of HHS. The rates established by the Medicare Fiscal Intermediary are the rates used by HHS when reimbursing the operator of Saint Elizabeths under the Medicare program.

According to plaintiff, under the automated billing system for the Hospital, patient census information is transmitted monthly from the automated clinical system to the automated billing system. *Id.* ¶ 10. Clinical staff members verify the inpatient census each night, and make any changes in leave status for each patient in the automated clinical system. Based on the patient census information transmitted from the automated clinical system to the automated billing system, the patient is billed for inpatient services only for the days the patient is actually receiving services on the ward. There is no charge for

leave days of any kind, including unauthorized leave, temporary leave, or convalescent leave. In addition, the automated billing system is designed to automatically exclude the date of discharge from the bill. If the patient is on temporary leave or convalescent leave, he or she may receive services at an outpatient mental health clinic affiliated with the Hospital. In that case, the patient is charged at the applicable outpatient rate for services received. Defendant disputes the accuracy of the records offered by plaintiff and claims that plaintiff may have overestimated some bills due to inaccuracies in the deduction of leave days from total hospital stays or for other reasons.

24. Plaintiff, in its second amended complaint of December 12, 2003, added a request for Prompt Payment Act, 31 U.S.C. § 3901 *et seq.* (2000), interest for its claims in Count I. The parties' briefs for the cross-motions decided here were all filed prior to December 12, 2003, and do not address plaintiff's request for interest on Count I claims. Because this issue has not been briefed by the parties, the court declines to discuss plaintiff's request for Prompt Payment Act interest for Count I claims in this opinion and leaves this issue for a later date, in the event that the parties are unable to reach an agreement on this matter during their quantum negotiations.

repairs and renovations to the Hospital. Pl.'s Mot. at i.[25] Plaintiff asserts that defendant failed to meet statutory requirements to assist in the repair and renovation of the Hospital upon transfer of the Hospital from HHS to the District. Defendant argues that plaintiff is not entitled to recovery because the amount sought exceeds the statutory liability of HHS, fixed by the sum appropriated by Congress for this purpose.

Defendant argues further that the parties entered into an accord and satisfaction, agreeing that a Congressional appropriation of $26.7 million represented payment in full of defendant's obligation under the Act for the repairs and renovations. Defendant relies on a letter which purportedly states that the $26.7 million transfer satisfied the government's responsibilities under 24 U.S.C. § 225b(f)(2)(A) to complete renovations of facilities identified in the District's preliminary system implementation plan. Def.'s Mot. at 41. Defendant argues that Congress' appropriation of funds for the transfer of the Hospital, and plaintiff's acceptance of those funds, satisfies HHS's obligations under the Act. This is especially true, defendant argues, in light of the fact that the District could have sought additional appropriations from Congress if it had needed them.

Plaintiff, on the other hand, argues that in preparation for the transfer of the Hospital to the District on October 1, 1987, and to ensure that the District would not inherit the heavy financial burden of repairing and renovating what HHS, itself, described as many obsolete buildings, the Act mandated that HHS incur the financial expense of making the necessary repairs and renovations. As previously discussed, to determine these costs the Act required the Secretary of HHS to contract for a physical plant audit of all existing facilities at the Hospital, which was to be completed by January 1, 1986. HHS contracted with AEPA to evaluate the physical plant and facility support systems under national and District codes and standards.

The Act provided that HHS begin, no later than October 1, 1987, and complete, by October 1, 1991, such repairs and renovations to the buildings and infrastructure of the Hospital identified by the District as required for its new comprehensive mental health system. The section was later amended to extend the deadline for completion of repairs and renovations to October 1, 1993, 24 U.S.C. § 225b(f)(2)(A), and to allow HHS to provide the necessary funds to the District, instead of requiring HHS to make the repairs and renovations itself. See Pub.L. No. 102–150, 105 Stat. 980 (1991).

Plaintiff claims that the Act requires HHS to pay for repairs and renovations to the buildings and facility support systems of the Hospital. See 24 U.S.C. § 225b(f)(2)(A). According to the AEPA audit, the estimated cost of repairing and renovating the buildings and associated support systems identified in the final system implementation plan was $32,980,624.[26] Pl.'s Mot. at 17. However, plaintiff alleges that HHS only forwarded $20,675,000 for these repairs, $12,305,624 less than the estimate in the AEPA audit. Id. With cost escalation through November 2002, plaintiff claims that the amount owed to it for unmet costs identified in the AEPA audit is $19,159,599.68. Id. at 18. Plaintiff also claims that the United States owes an additional amount of $2,028,000, included in Count IV, for asbestos removal that was only partially paid for by Congressional appropriation but which is owed to the District pursuant to the Transfer Act. Id. at 28.

In order to determine what exactly was required of the parties by the Act, the court looks to the Act itself. The Act required HHS to obtain a physical plant audit for use in preparing the system implementation plan. Per the statute, the audit would assist the Mayor in the development of the system implementation plan. The physical plant audit was to be completed by January 1, 1986. 24 U.S.C. § 225b(f)(1). In addition, the Act required HHS to conduct a financial audit of

---

**25.** This figure was considerably higher in the complaint: $60,497,253. Compl. ¶ 40.

**26.** This figure differs from the figure reported in the complaint, in which the AEPA audit is said to have estimated $56,460,562 for the costs of necessary repairs and renovations to Saint Elizabeths. Compl. ¶ 38. This difference of approximately twenty-three million dollars is unexplained.

the existing facilities of the Hospital, also to be completed by January 1, 1986.

The system implementation plan would "identify those positions, programs, and functions at [the] Hospital which are proposed for assumption by the District, [and] those facilities at [the] Hospital which are proposed for utilization by the District under a comprehensive mental health system"; "identify any capital improvements to facilities at [the] Hospital ... proposed for delivery of mental health services"; and "identify the specific real property, buildings, improvements, and personal property to be transferred ... needed to provide mental health and other services provided by the Department of Human Services under the final system implementation plan." *Id.* § 225b(c). The Act required HHS to begin the proposed repairs and renovations no later than October 1, 1987 and complete them by no later than October 1, 1993. *See id.* § 225b(f)(2)(A).

In 1991, Congress amended the Transfer Act to reflect that HHS had the option of paying the District to do the repair work itself. *Id.* § 225b(f)(2)(A), (C). In this regard, the Act states that "the Secretary may enter into an agreement with the Mayor [of the District of Columbia] to complete the repairs and renovations ... and to make other capital improvements that are necessary for the safe and cost effective delivery of mental health services in the District, except that $7,500,000 of the funds provided the Mayor under such agreement shall be used to make capital improvements to facilities not located at [the] Hospital." *Id.* § 225b(f)(2)(C).

After passage of the Act, HHS sought and obtained Congressional approval to provide the District with funds appropriated for purposes related to the Transfer Act. According to defendant, in 1987 Congress appropriated approximately $26.7 million for the specific purpose of carrying out 24 U.S.C. § 225b. Def.'s Mot. at 32 (citing Pub.L. No. 100–202, Title II, 101 Stat. at 1329–267). HHS paid this sum to the District. Def.'s App. at 296–97. Defendant alleges that HHS also paid the District an additional $3.8 million representing the unobligated balance from the Saint Elizabeths Construction and Renova-

tion Fund. Def.'s Mot. at 32; *see also* Def.'s App. at 294–95. Defendant claims that Congress specifically authorized use of these funds, like the $26.7 million appropriation, to pay the District for work under section 225b. Plaintiff claims that the appropriated funds were not sufficient to finance the necessary repairs and renovations to bring the Hospital up to code, and therefore, additional funds must be paid by HHS to comply with the Act. Defendant argues that the United States fulfilled its financial obligation to the District by virtue of the congressional appropriations.

The issue to be determined here is whether HHS has already satisfied its statutory obligation to the District, or, rather, is the District entitled to an additional sum pursuant to the Transfer Act for the repairs and renovations of the Hospital campus.

### a. Congressional Appropriations To Fulfill the Purposes of the Transfer Act

To assist the court in discerning whether the United States' obligation to the District under the Act has been satisfied, the court reviews the legislative history of the appropriations related to the Act. In 1987, Congress made two appropriations to the District in accordance with the Act. The first was for $29 million. *See* Pub.L. No. 100–202, 101 Stat. at 1329–91 (1987). Congress did not specify for what purpose this appropriation was to be used. The second appropriation was for $62,793,000. Pub.L. No. 100–202, 101 Stat. at 1329–267 (1987). The language of this appropriation reflects that Congress set aside certain monies:

To carry out the Saint Elizabeths Hospital and District of Columbia Mental Health Services Act, $62,793,000, together with any unobligated balances from "Saint Elizabeths Hospital, Construction and Renovation" (except those balances determined by the Secretary of Health and Human Services to be necessary to carry out existing Federal renovation contracts), all of which shall be available in fiscal year 1988 for payments to the District of Columbia as authorized by sections 2, 4, and 9 of the Act; and in addition, $2,609,000 which shall be available through September 30, 1989

for Federal activities authorized by sections 6 and 9 of the Act: *Provided,* That funds appropriated under this heading may be used for multi-year contracts with the District of Columbia for maintenance of Saint Elizabeths Hospital: Provided further, That any amounts determined by the Secretary of Health and Human Services to be in excess of the amounts requested and estimated to be necessary to carry out sections 6 and 9(f)(2) of the Act shall be returned to the Treasury.[27]

Pub.L. No. 100–202, 101 Stat. at 1329–267.[28]

Defendant asserts that Congress appropriated $26.7 million for HHS to furnish the District with funds for renovations and repairs to the Hospital and that this appropriation, along with the $3.8 million in unobligated funds also disbursed to the District, satisfies the government's obligation to the District. This appropriation does not, however, necessarily fulfill the mandate under the Transfer Act for repairs and renovations. Although an exhibit referred to by defendant indicates that on April 13, 1989 the District acknowledged that it received approximately $26.7 million pursuant to the Act for Hospital renovations, Def.'s App. at 300,[29] the government has not set forth evidence that clearly shows that these Congressional appropriations completely fulfilled the payment obligations of the United States under the Act.

Merely because Congress has appropriated money and transferred funds to the District does not mean that the government's obligation has been fulfilled under the final system implementation plan or under the Act, or that the District is precluded from seeking additional funds owed to it. The referenced appropriation and transfer simply mean that the District has received some funds to pay for repairs and renovations. An appropriation with limited funding is not assumed to amend substantive legislation creating a greater obligation. *See N.Y. Airways, Inc. v. United States,* 177 Ct.Cl. 800, 369 F.2d 743, 749 (1966) ("As a general proposition Congress has the power to amend substantive legislation for a particular year by an appropriation act, although such procedure is considered undesirable legislative form and subject to a point of order. An amendment will not readily be inferred. The intent of Congress to effect a change in the substantive law via provision in an appropriation act must be clearly manifest. The application of the limitation in the appropriation provision to a single year suggests that no change in substantive law was intended.") (citing *NLRB v. Thompson Prods.,* 141 F.2d 794 (9th Cir.1944)).

Although defendant cites a number of HHS documents, excerpts of testimony and reports from the legislative history of appropriations related to the Transfer Act that

---

**27.** The remaining language of the appropriation states:

> In fiscal year 1988 the maximum amount available to Saint Elizabeths Hospital from Federal sources shall not exceed the total of the following amounts: the appropriations made under this heading, amounts billed to Federal agencies and entities by the District of Columbia for services provided at Saint Elizabeths Hospital, and amounts authorized by titles XVIII and XIX of the Social Security Act. This maximum amount shall not include Federal funds appropriated to the District of Columbia under "Federal Payment to the District of Columbia" and payments made pursuant to section 9(c) of Public Law 98–621. Amounts chargeable to and available from Federal sources for inpatient and outpatient services provided through Saint Elizabeths Hospital as authorized by 24 U.S.C. 191, 196, 211, 212, 222, 253, and 324; 31 U.S.C. 1535; and 42 U.S.C. 249 and 251 shall not exceed the estimated total cost of

> such services as computed using only the proportionate amount of the direct Federal subsidy appropriated under this heading.
> Pub.L. No. 100–202, 101 Stat. at 1329–267 to 1329–268.

**28.** The Act itself also specified particular appropriations. Section 225g(a) of the Act obligated the Secretary of HHS to appropriate funds for grants to the District subsidizing a comprehensive mental health system in the following amounts: $30,000,000 for fiscal year 1988, $24,000,000 for fiscal year 1989, $18,000,000 for fiscal year 1990 and $12,000,000 for fiscal year 1991. 24 U.S.C. § 225g(a).

**29.** Defendant's exhibit is a letter dated April 13, 1989 in which the District's Commission on Mental Health Services (CMHS) acknowledged that the District had received $26.7 million from HHS for Hospital renovations. The letter is signed by Michael J. English, Chief Administrative Officer of CMHS.

might tend to show some intent to satisfy the obligations of the United States under the Act, Def.'s Mot. at 37–41, these records do not unambiguously show a congressional intent to conform the provisions of the Transfer Act, related to repairing and renovating Saint Elizabeths, to the level of funding provided for that purpose in the appropriations in 1987. Plaintiff offers similar citations to the legislative history of the appropriations related to the Act that would tend to show just the opposite, that the appropriations were not meant to fully satisfy the mandate for payment under the Act. Pl.'s Reply at 36–42. Indeed, all that the court is able to conclude from its reading of the citations offered by both parties on this subject is that Congress had every intention of fully funding the repairs and renovations that were indicated to be necessary in the AEPA audit. That obligation has not been shown to have been fully satisfied by the 1987 appropriations to HHS which included the payments by HHS to the District of $26.7 million and $3.8 million.

### b. Defendant's Accord and Satisfaction Argument

Defendant argues that plaintiff's acceptance of the congressional appropriation constituted an accord and satisfaction of plaintiff's claims under the Transfer Act for repair and renovation monies. Plaintiff, on the other hand, argues that there has been no legally enforceable accord and satisfaction of the District's claim for Count IV because Michael English, the District employee whose signature appears on the letter claimed by the government to constitute the accord and satisfaction, see Def.'s App. at 300, had no legal authority to settle the claim. Even if he did, plaintiff argues, he did not agree in that letter that the appropriation satisfied federal responsibilities for the final system implementation plan, which, according to plaintiff, is the operative, legally binding document that determines the extent of liability on the part of the United States. Plaintiff also argues that there was no meeting of the minds with respect to the alleged accord and satisfaction because Mr. English signed the letter under economic duress.

Prior to addressing the issue as to whether defendant's statutory obligation is discharged by the alleged accord and satisfaction, the court notes that defendant failed to plead accord and satisfaction as an affirmative defense as required under RCFC 8(c) (listing accord and satisfaction as an affirmative defense which "shall" be pled). An affirmative defense is usually waived if not raised in defendant's answer. See Crocker v. United States, 130 Ct.Cl. 567, 127 F.Supp. 568, 573 (1955); see also RCFC 8(c). However, the purpose of Rule 8(c) is simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that the party is prepared to properly litigate it. Al–Kurdi v. United States, 25 Cl.Ct. 599, 604 (Cl.Ct.1992) (citing Hassan v. United States Postal Serv., 842 F.2d 260, 263 (11th Cir.1988)). Failure to plead an affirmative defense does not automatically extinguish the defense. See Cities Serv. Helex, Inc. v. United States, 211 Ct.Cl. 222, 543 F.2d 1306, 1313 n. 14 (1976). In general, a court may allow a non-pled affirmative defense to be raised if it would not result in prejudice to the opposing party. See id. (finding that "since the plaintiffs have ably and thoroughly responded to the Government's arguments, showing no prejudice from the injection of the issue at this stage, and all parties have exhaustively treated it, we will consider the defense on the merits").

In this instance, no prejudice has resulted in the assertion of defendant's accord and satisfaction defense because both parties have fully and adequately briefed the issue in their submissions to the court. See Al–Kurdi, 25 Cl.Ct. at 604 ("Plaintiff was not prejudiced by defendant's failure to assert the affirmative defense of statute of frauds [because] [p]laintiff has adequately argued against defendant's motion for summary judgment."). The court also does not deem that further discovery would advance its consideration of this issue.

▮▮▮ Defendant has not established a valid accord and satisfaction under the facts as presented. In its most common form, an accord and satisfaction exists as " 'a mutual agreement between the parties in which one pays or performs and the other accepts pay-

ment or performance in satisfaction of a claim or demand which is a bona fide dispute.'" *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed.Cir.2002) (quoting *Nev. Half Moon Mining Co. v. Combined Metals Reduction Co.*, 176 F.2d 73, 76 (10th Cir.1949)). An "'accord' is 'an agreement by one party to give or perform and by the other party to accept, in settlement or satisfaction of an existing or matured claim, something other than that which is claimed to be due.'" *Thomas Creek Lumber & Log Co. v. United States*, 36 Fed.Cl. 220, 237–38 (1996) (quoting *Chesapeake & Potomac Tel. Co. v. United States*, 228 Ct.Cl. 101, 654 F.2d 711, 716 (1981) (internal quotation omitted)). Satisfaction, on the other hand, denotes "'the execution or performance of the agreement, or the actual giving and taking of some agreed thing.'" *Id.* at 238 (quoting *Chesapeake*, 654 F.2d at 716 (internal quotation omitted)). "The legal doctrine of accord and satisfaction assumes that a bona fide dispute exists prior to discharge of the debt." *Id.* "[T]o be a bona fide dispute, the dispute must have existed or been asserted prior to the time that the accord and satisfaction is claimed to have occurred." *Id.* (citing *Edwards v. United States*, 22 Cl.Ct. 411, 422 (1991)).

■ "A claim is discharged by the doctrine of accord and satisfaction when 'some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim.'" *Case, Inc. v. United States*, 88 F.3d 1004, 1011 n. 7 (Fed.Cir.1996) (quoting *Cmty. Heating &*

*Plumbing Co. v. Kelso*, 987 F.2d 1575, 1581 (Fed.Cir.1993)). Accord and satisfaction is established if these four elements are present: "(1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration." *O'Connor*, 308 F.3d at 1240 (citing *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 343 F.2d 951, 955 (1965)); *see Thomas Creek Lumber*, 36 Fed.Cl. at 238 (same). If the proponent of the claim "fails to establish the existence of any of these basic elements, the defense fails." *Spalding & Son, Inc. v. United States*, 24 Cl.Ct. 112, 154 (1991), *rejected on other grounds by* 28 Fed.Cl. 242 (1993). "Further, the intention of the parties is a critical element of an accord and satisfaction." *W & F Bldg. Maint. Co. v. United States*, 56 Fed.Cl. 62, 66 (2003) (citing *Tri–O, Inc. v. United States*, 28 Fed.Cl. 463, 470 (1993)).

■ In applying the law of accord and satisfaction, the court must first determine whether proper subject matter is present. Proper subject matter is present when the subject matter of the underlying agreement between the parties is the same as that set forth in the documents which are alleged to modify the agreement and to provide the basis for the accord and satisfaction.[30] *See Thomas Creek Lumber*, 36 Fed.Cl. at 238 (citing *King Fisher Marine Serv. Inc. v. United States*, 16 Cl.Ct. 231, 236 (1989)). In this instance, the agreement to be evaluated is outlined in the Act which sets forth the statutory obligation of the United States to fund the District's renovation and repair of the Hospital. The parties do not allege that

---

**30.** In applying the doctrine of accord and satisfaction to a statutory entitlement claim, rather than to a contract claim, the concept of a pre-existing and underlying agreement establishing legal rights must be read broadly to include a money-mandating statutory provision. Here in Count IV, instead of a contract right, the parties have argued and the court has analyzed plaintiff's claims as being created through statutory entitlement. A claim may be based on either a contractual or statutory right, and the defense of accord and satisfaction may be raised in either context. *See O'Connor*, 308 F.3d at 1244 (finding that an accord and satisfaction agreement had extinguished plaintiffs' statutory entitlement claims under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–219 (2000)); *Brock &*

*Blevins*, 343 F.2d at 954 (finding that an accord and satisfaction in a contract modification had extinguished plaintiff's claim). Because the parties have not presented arguments relying on express contract or implied-in-fact contract theories for the District's claims in Counts I, IV and VI, the court has not discussed that potential avenue for relief because statutory entitlement was sufficient to decide both jurisdiction for and the merits of these claims. The court does not rule out jurisdiction and liability under contractual theories, however, given the unique nature of the Transfer Act and its offer of funding as a *quid pro quo* for the assumption by the District of Columbia of responsibility for the mental health system serving the nation's capital.

the Secretary of HHS and the District entered into any other written agreement regarding the transfer of funds from the federal government to the District for Hospital repairs. Defendant relies upon the April 13, 1989 letter confirming that $26.7 million was transferred to the District per the Act for repairs and renovations to Saint Elizabeths. Def.'s App. at 300. The subject matter of the letter is the same as that contained in the Act—both refer to compensating the District for renovations and repairs to the Hospital. Accordingly, the court finds that the first prong of the accord and satisfaction test has been satisfied.

■ The second element of accord and satisfaction is that the parties must be competent to negotiate the modification of the agreement. *Thomas Creek Lumber,* 36 Fed. Cl. at 238. To be "competent" one must have the authority to bind a party to the accord portion of an accord and satisfaction. *See id.* at 242 (stating that "the individuals identified by plaintiff, who it alleges acted on the behalf of the [United States] to arrive at the alleged accord and satisfaction, were not competent to compromise the government's claims against the plaintiff" because they had no authority to do so). It is fundamental to the rules of federal government contracts that to recover under a contract with the United States, a plaintiff must demonstrate that the " 'officer whose conduct is relied upon had actual authority to bind the government in contract.' " *Id.* (quoting *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.1984)). Similarly, an official of the government of the District of Columbia must have actual authority, either express or implied, to make an agreement which is legally binding on the District. *See District of Columbia v. Greene,* 806 A.2d 216, 222 (D.C. 2002) (stating that "a party contracting with the government is 'on constructive notice of

the limits of the [government agent's] authority,' and cannot reasonably rely on representations to the contrary") (quoting *Leonard v. District of Columbia,* 801 A.2d 82, 86 (D.C.2002)); *A.S. McGaughan, Co.,* DCCAB No. D–926, 1999 WL 1417248 (Nov. 18, 1999) (holding that either express actual authority or implied actual authority must have been given to the District employee alleged to have bound the District for the agreement to be binding).

The doctrine of apparent authority, which can operate to bind private parties by the acts of their agents, does not apply to the actions of government officials.[31] *See, e.g., City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990); *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir. 1989) ("Although apparent authority will not suffice to hold the government bound by the acts of its agents, implied actual authority, like expressed actual authority, will suffice.") (citations omitted); *A.S. McGaughan, Co.,* DCCAB No. D–926, 1999 WL 1417248 (stating that "the doctrine of apparent authority is inoperative to bind the [District's] Government to acts of its agents who exceed their authority") (citation omitted). Government employees possess express actual authority to bind the government in contracts only when such authority is granted unambiguously by a statute, regulation or rule. *Garza v. United States,* 34 Fed.Cl. 1, 20 (1995) (stating that a plaintiff must prove an affirmative grant of government contracting authority "by pointing to some unambiguous statute, regulation or rule"). Even implied actual authority of a government employee must be derived from a grant of express authority. *See, e.g., Fifth Third Bank of W. Ohio v. United States,* 402 F.3d 1221, 1235 (Fed.Cir.2005) (finding implied actual authority to have been given to a government actor by a delegation of express contracting au-

---

**31.** "Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." Restatement (Second) of Agency § 8 (1958). This authority "is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the princi-

pal consents to have the act done on his behalf by the person purporting to act for him." *Id.* § 27. "[A] party contracting with the government cannot rely upon apparent authority but instead has the burden of knowing the law and ascertaining whether the one purporting to contract for the government is staying within the bounds of his or her authority." *Johnson v. United States,* 15 Cl.Ct. 169, 174 (1988) (citations omitted).

thority); *Garza*, 34 Fed.Cl. at 20 (citing cases).

In this instance, plaintiff argues that Michael English, Chief Administrative Officer for the District's Commission on Mental Health Services, did not have the authority to bind the District to a release of claims for further reimbursements from the Act, and the court agrees with plaintiff that no valid accord and satisfaction was created between the parties for this reason. The government has presented no evidence that Michael English had express actual authority to settle this claim on behalf of the District. Under D.C.Code Ann. § 2–406 (2001) (previously codified at D.C.Code Ann. § 1–1206 (1981)), only the Mayor is authorized to compromise any "claim or suit" on behalf of the District. Defendant has proffered no evidence that the District's Mayor delegated authority to compromise claims to Mr. English. Thus, Mr. English is not alleged to have had implied actual authority either. Because Mr. English was not a competent party to enter into an accord and satisfaction of the District's claims in Count IV, defendant's affirmative defense fails. Because one of the four essential elements of accord and satisfaction is not present, the court need go no further in its analysis.

The court notes, however, that even if defendant had satisfied the first two elements of accord and satisfaction, the factual inquiry into the "meeting of the minds" element of accord and satisfaction might also prove fatal to defendant's defense. Although Mr. English's letter does state that a unit of the District's government, the Commission on Mental Health Services "concurs" that the $26.7 million appropriation "satisfies Federal responsibilities" under the Act for "renovations of facilities identified in the District of Columbia Preliminary System Implementation Plan," Def.'s App. at 300, this statement fails to resolve the issue. An ambiguity remains as to whether the aforementioned appropriation was accepted in full satisfaction of the federal liabilities under the Transfer Act for renovations identified in the final system implementation plan, arguably a document of greater legal significance in determining the liability of the United States under 24 U.S.C. §§ 225b(c)(7), 225c(b), as opposed to the preliminary system implementation plan.

When the discharge of claims alleged to have occurred in an accord and satisfaction is ambiguous, the court may examine extrinsic evidence to determine the intent of the parties. *See Jackson Constr. Co. v. United States*, 62 Fed.Cl. 84, 93 (2004) (stating that the "[c]ourt must focus on whether or not the parties' objective manifestations of intent demonstrate that they reached a meeting of the minds with respect to the release of additional claims ... where a purported release is ambiguous in its scope") (citing *Dureiko v. United States*, 209 F.3d 1345, 1356–57 (Fed.Cir.2000); *McLain Plumbing & Elec. Serv., Inc. v. United States*, 30 Fed.Cl. 70, 80–81 (1993)). Also, "in the absence of sufficient factual allegations supporting the parties' mutual intent, we construe the ambiguous contract provision against the drafter, unless the ambiguity is patent." *Dureiko*, 209 F.3d at 1357 (citations omitted). Although defendant offers no extrinsic evidence to show that a meeting of the minds occurred to release the claims now asserted in Count IV, plaintiff has proffered evidence which tends to show that no meeting of the minds took place.

The evidence proffered by plaintiff indicates that Mr. English believed that the $26.7 million appropriation was an insufficient sum to bring the Hospital into compliance with applicable codes. *See* Pl.'s Supp. App. at 72–74. Mr. English's deposition testimony also stated that his signature was the result of pressure from HHS and was required in order to obtain and be able to utilize funding for the Hospital. *Id.* at 66–67. Finally, Mr. English testified that the letter was drafted by the HHS official managing the Saint Elizabeths transition, not by Mr. English. *Id.* at 64–66. Although a factual inquiry into the dispute over the parties' alleged meeting of the minds is not appropriate at the summary judgment phase of this litigation, *see, e.g., Celotex*, 477 U.S. at 322, 106 S.Ct. 2548 (stating that summary judgment may be granted only if no genuine issue of material fact exists); *see also Don Webster Co. v. Ind. W. Express, Inc.*, 186 F.Supp.2d

958, 961 (S.D.Ind.2002) (noting that "there is a general reluctance reflected in Indiana case law to grant summary judgment on accord and satisfaction, a defense in which the intent of both parties is a key element") (citation omitted); *cf. Lincoln Nat. Life Ins. Co. v. Prodromidis,* 862 F.Supp. 10, 12 (D.Mass. 1994) ("The resolution of the accord and satisfaction issue, although in some instances a question of fact, is a question of law for the Court to decide when the facts are undisputed.") (citations omitted), defendant would have to overcome the implications of these alleged facts to prove that a meeting of the minds occurred in order to successfully assert that an accord and satisfaction was reached to discharge the claims of Count IV. Thus, even if this court has erred concerning Mr. English's lack of authority to bind the District to an accord and satisfaction of the claims in Count IV, further proceedings would be necessary to determine the validity of defendant's accord and satisfaction defense.

■ The court finds that no accord and satisfaction was entered into by the District and the United States for the claims in Count IV. Accordingly, defendant's motion for partial summary judgment on this issue is denied. The court finds that the United States is liable under the Act for the costs to repair and renovate the Hospital and that defendant has failed to establish that this statutory obligation was discharged.

### c. Plaintiff's Claim for Escalation Costs

Plaintiff claims that in addition to the $12,305,624 that the federal government has failed to transfer to the District for repairs, plaintiff is entitled to escalation costs for inflation up through November 2002 which brings the total amount owed to the District to $19,159,856.58. Pl.'s Facts ¶ 26. The parties dispute whether defendant is liable for escalation costs for inflation under the Act. Defendant argues that because the Act provides no waiver of sovereign immunity for escalation costs, defendant cannot be held liable. Although defendant is liable for the costs to repair and renovate the Hospital, for the reasons discussed below, the court finds that plaintiff is not entitled to escalation costs.

■ Statutory entitlement to prejudgment interest or a cost escalation factor must be established for the United States to be held liable for these types of claimed costs. "In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award." *Library of Congress v. Shaw,* 478 U.S. 310, 314, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) (*Shaw* ), *superseded by statute as recognized in Jones v. Washington Metro. Area Transit Auth.,* 205 F.3d 428, 434 n. 7 (D.C.Cir.2000); *see also Doyle v. United States,* 931 F.2d 1546, 1550 (Fed.Cir.1991) (finding that because the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–219 (2000), has no express waiver of sovereign immunity with respect to a liquidated damages award for interest or delay damages, plaintiff could not recover interest on liquidated damages); *Lichtman v. Office of Pers. Mgmt.,* 835 F.2d 1427, 1428 (Fed.Cir.1988) (finding that a statute discussing the functions of the OPM director to include the securing of "justice" did not allow for the payment of interest by OPM for delayed annuity payments because there was no express statutory provision for the payment of interest); *Saunders v. Claytor,* 629 F.2d 596, 598 (9th Cir.1980) (finding that the plaintiff was not entitled to a "constant dollars" inflationary adjustment on a back pay award because Title VII did not expressly authorize the payment of interest on back pay and because the inflation factor sought by the plaintiff mimicked an interest award). Congress expressly retained the government's immunity from awards of interest by this court, permitting it only where expressly agreed to under contract or allowed by statute. *See* 28 U.S.C. § 2516(a).

■ *Shaw* is the seminal case on this issue and deserves a brief discussion. *Shaw* was a suit arising under Title VII's fee-shifting provision, 42 U.S.C. § 2000e–5(k). *See* 478 U.S. at 312, 106 S.Ct. 2957. The trial court first calculated the liability for attorney's fees according to a lodestar formula, and then, to compensate plaintiff for a five-year delay in receiving payment for attor-

ney's fees, awarded a thirty percent enhancement of the fee amount. However, the Supreme Court found such an award to be improper because of the longstanding no-interest rule. *Id.* at 316, 106 S.Ct. 2957. The Supreme Court reasoned that "[f]or well over a century," it had "consistently . . . recognized that federal statutes cannot be read to permit interest to run on a recovery against the United States unless Congress affirmatively mandates that result." *Id.* Because neither the statute nor its legislative history referred to interest, the Supreme Court concluded that the government was not liable for interest on fees. *Id.* at 319, 106 S.Ct. 2957. Unpersuaded by the plaintiff's argument that the no-interest rule did not prohibit the award of compensation for delay, the Supreme Court stated that "[i]nterest and a delay factor share an identical function. They are designed to compensate for the belated receipt of money. . . . [They] are functionally equivalent . . . ." *Id.* at 322, 106 S.Ct. 2957; *see also Doyle,* 931 F.2d at 1551 ("Whether labeled liquidated damages for delay, delay damages, or interest, plaintiffs have no statutory basis for recovery."); *Applegate v. United States,* 52 Fed.Cl. 751, 770 (2002) ("[A] request to be compensated for 'delay' is tantamount to a request for interest . . . ."). It is clear from the jurisprudence of this court and higher courts that no matter what term plaintiff uses, compensation for the belated receipt of money violates the no-interest rule absent an express statutory waiver of sovereign immunity from liability for interest.

■■■ According to the Federal Circuit, "in the absence of a clear, explicit waiver of sovereign immunity from liability for interest, the United States government . . . pays all judgments and amounts due in what economists call 'nominal dollars' rather than in economic 'real dollars.'" *Sandstrom v. Principi,* 358 F.3d 1376, 1377 (Fed.Cir.2004); *see also U.S. Shoe Corp. v. United States,* 296 F.3d 1378, 1381 (Fed.Cir.2002). The Federal Circuit explained that while nominal dollars retain their face value over time, real dollars retain their true value. *Sandstrom,* 358 F.3d at 1377 n. 1. For example, one nominal dollar in 1969 equals one nominal dollar in 1996. However, one real dollar in 1969 would retain its purchasing power and would be worth between four and five dollars in 1996. *Id.* "The relationship between real and nominal dollars is governed by inflation. Interest paid at the rate of inflation allows payments to retain their real value." *Id.; see Ind. Mich. Power Co. v. United States,* 60 Fed.Cl. 639, 653 (2004) ("Present value adds an escalation factor for past costs . . . .").

In *Sandstrom,* the plaintiff sought interest for past-due benefits from the Department of Veterans Affairs, arguing that without interest which would compensate him in real dollars, he would suffer significant loss because the timely-paid benefits would have had greater real value than his nominal dollar award. *Id.* at 1378. The Court of Appeals for Veterans Claims denied plaintiff's request on the basis of sovereign immunity. *Id.* The Federal Circuit agreed with the lower court, stating that "[u]nder the longstanding 'no-interest rule,' sovereign immunity shields the U.S. government from interest charges for which it would otherwise be liable, unless it explicitly waives that immunity." *Id.* at 1379. The Federal Circuit reasoned:

> "The case, therefore, falls within the well-settled principle, that the United States are not liable to pay interest on claims against them, in the absence of express statutory provision to that effect. It has been established, as a general rule, in the practice of government, that interest is not allowed on claims against it, whether such claims originate in contract or in tort, and whether they arise in the ordinary business of administration or under private acts of relief, passed by Congress on special application. The only recognized exceptions are, where the government stipulates to pay interest and where interest is given expressly by an act of Congress, either by the name of interest or by that of damages."

*Id.* at 1379–80 (quoting *Angarica v. Bayard,* 127 U.S. 251, 260, 8 S.Ct. 1156, 32 L.Ed. 159 (1888)); *see also United States v. N.Y. Rayon Importing Co.,* 329 U.S. 654, 663, 67 S.Ct. 601, 91 L.Ed. 577 (1947) (*N.Y.Rayon*) ("[T]he immunity of the United States from liability for interest is not to be waived by policy

arguments .... Courts lack the power to award interest against the United States on the basis of what they think is or is not sound policy. We reiterate that only express language in a statute or contract can justify the imposition of such interest.").

The plaintiff in *Sandstrom* contended that because his request was for a cost-of-living increase, and not for interest, the no-interest rule should not apply. 358 F.3d at 1380. However, the Federal Circuit noted that "[e]conomists use interest, COLAs, indices, and various other mechanisms to translate time series of nominal dollars into meaningful constant dollars. They may apply different labels at different times, but the purpose of all such adjustment mechanisms is identical. The government relies on its sovereign immunity shield to deny all prejudgment-type interest payments." *Id.* (footnote omitted). The Federal Circuit reasoned in *Sandstrom* that the statute relied upon by plaintiff, 38 U.S.C. § 1114(n), did not address the issue of retroactive payments, nor did it provide an explicit waiver of the government's sovereign immunity from interest accruing to retroactive payments. *Id.* The Federal Circuit thus concluded that "[w]ithout a clear, explicit waiver of sovereign immunity, compensatory payments from the government cannot have the same effect as timely payments regardless of the statutory language. The existing statutory language does not waive sovereign immunity, either explicitly or by implication. The VA's decision to pay Sandstrom in nominal dollars was legally correct." *Id.* at 1381.

In *U.S. Shoe,* the Federal Circuit found that no prejudgment interest was due on unconstitutional taxes exacted by the Harbor Maintenance Tax, 26 U.S.C. § 4461(b) (2000), a tax imposed on commercial cargo port use. 296 F.3d at 1380–81. The Federal Circuit noted that if prejudgment interest is not explicitly granted by a statute, "the Supreme Court has held only the Fifth Amendment of the Constitution to mandate the payment of interest." *Id.* (citing *Shaw,* 478 U.S. at 317 n. 5, 106 S.Ct. 2957; *Smyth v. United States,* 302 U.S. 329, 353–54, 58 S.Ct. 248, 82 L.Ed. 294 (1937); *Boston Sand & Gravel Co. v. United States,* 278 U.S. 41, 47, 49 S.Ct. 52, 73 L.Ed. 170 (1928)). In *U.S. Shoe,* the Federal

Circuit found that the Harbor Maintenance Tax was not a taking in violation of the Fifth Amendment. *Id.* at 1383. Because no statute or constitutional provision mandated the payment of prejudgment interest on the illegally exacted Harbor Maintenance Tax, no interest could be awarded to the plaintiff. *Id.* at 1386 ("[A] waiver of sovereign immunity for an award of interest must be affirmative and unequivocal." (citing *Shaw,* 478 U.S. at 311, 106 S.Ct. 2957)).

Plaintiff argues that the escalation amount sought here is "not meant to compensate the District for either a 'loss in the use of money or the value of money,' " but rather functions to update the 1986 AEPA cost estimate to a 2003 cost estimate which would satisfy the Act's directive that HHS provide funds that will be sufficient to complete the repair and renovations to Saint Elizabeths. *See* Pl.'s Reply at 58 (quoting *Shaw,* 478 U.S. at 322, 106 S.Ct. 2957). The amount of money needed to complete the repairs in 2003, plaintiff argues, is more than what was required in 1986. *Id.* at 61. In support of this argument, plaintiff relies on *Masonry Masters, Inc. v. Nelson,* 105 F.3d 708 (D.C.Cir.1997).

In *Masonry Masters,* the District of Columbia Circuit discussed cost-of-living adjustments to attorney's fees awarded under the Equal Access to Justice Act, 28 U.S.C. § 2412 (EAJA). 105 F.3d at 710. The appeals court was presented with two methods for calculating the cost-of-living increases sought and had to decide which method was appropriate under the law. *Id.* at 710–11. EAJA specifically provided that:

> The amount of fees awarded under this subsection shall be based on prevailing market rates ..., except that ... attorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor ... justifies a higher fee.

28 U.S.C. § 2412(d)(2)(a) (1994). The district court had applied a "historic" enhancement to the base attorney's fee rate, to correct for cost-of-living increases that occurred during the litigation over the substantive matters in the suit. *Masonry Masters,* 105 F.3d at 710.

On appeal, Masonry Masters asked the District of Columbia Circuit to adopt a supplemental cost-of-living enhancement, based on a "current" billing rate corrected for cost-of-living increases during further litigation over the attorney's fees themselves, to "compensate for delay in payment for services rendered years earlier." *Id.* The government argued that such compensation for delay is the equivalent of interest and is barred by the long-standing rule prohibiting recovery of interest against the United States unless the government has expressly waived its sovereign immunity. *Id.* at 711 (citing *Angarica,* 127 U.S. at 260, 8 S.Ct. 1156). Masonry Masters argued that EAJA's cost-of-living provision constituted the necessary waiver.

The District of Columbia Circuit disagreed. *Id.* at 712. First, the court found that adding a "current" enhancement for attorney's fees, over and beyond the inflationary adjustment to the rate per hour for services provided in a particular year of the substantive litigation, accomplished more than a reasonable correction to EAJA's statutory base rate. Instead, it compensated for a delay in payment by providing an interest component. *Id.* at 711. Second, the court noted that EAJA did not provide an express waiver of sovereign immunity for an interest payment and therefore, such an award was impermissible. "Waivers of immunity from interest must be clearly stated in the language of the statute." *Id.* at 712.

The District of Columbia Circuit found that EAJA's cost-of-living enhancement language fell short of an unambiguous statutory waiver of immunity. *Id.* The court found that the provision of EAJA allowing fee increases was not comparable to other statutory provisions found to have waived the sovereign immunity of the United States from liability for interest awards. For example, the court noted that in response to *Shaw,* Congress amended Title VII to provide government employees " 'the same interest to compensate for delay in payment [as is] available ... in cases involving nonpublic parties.' " *Id.* (quoting 42 U.S.C. § 2000e–16(d) (1994)). Because similarly unambiguous waiver language did not appear in the

EAJA fee enhancement provision, the court concluded that EAJA did not waive the government's immunity from interest on fees.

*Masonry Masters* does not help plaintiff's cause. The EAJA section relied upon by the court in *Masonry Masters* contained specific language allowing for a correction of the statutory base fee rate to reflect a reasonable market rate. It did not permit a further adjustment to compensate for delays in payment that occurred after the attorney's services were performed. The Federal Circuit has interpreted that EAJA adjustment provision in the same way, and that precedent forbids this court from expanding the liability of the United States for interest beyond the strict parameters established by statute:

> In analyzing whether Congress has waived the immunity of the United States, we must construe waivers strictly in favor of the sovereign, and not enlarge the waiver " 'beyond what the language requires.' " The no-interest rule provides an added gloss of strictness upon these usual rules.

*Chiu v. United States,* 948 F.2d 711, 720 (Fed.Cir.1991) (also finding that EAJA did not waive sovereign immunity against interest on attorney's fees) (citations omitted). This court must examine the Transfer Act to see if any cost adjusting provisions, such as the one found in EAJA, permit plaintiff to escalate its costs.

The Transfer Act contains no language concerning adjustments to costs. Instead, the Act contemplates the disbursement of funds by HHS to the District, earmarked for repairs and renovations to be completed by the District, in an amount sufficient to correct identified deficiencies in existing buildings and infrastructure. 24 U.S.C. § 225b(f)(2)(A), (C). There is nothing in this statutory language which could be read to waive the United States' sovereign immunity from liability for interest because of a delayed payment of the full amount mandated by the statute, which was to be paid as part of the overall transfer of the Hospital in late 1987. Nor can the court find any support in the Transfer Act for plaintiff's contention that the liability of the United States was fixed, not by the contemporaneous interpretation of the AEPA audit estimate of the

costs of repairs and renovations needed to fulfill the District's mental health services system implementation plan, *see id.* § 225b(f)(1), (2)(A), but by the inflated costs of repairs and renovations that might occur fifteen or more years in the future.

Plaintiff argues that the Transfer Act, "[o]n its face[,] ... requires that the AEPA cost estimates be adjusted [to 2003 costs] in order to achieve the statutory directive." Pl.'s Reply at 61. The provision alleged to accomplish this inflationary adjustment, an adjustment which, according to the caselaw cited, *supra,* would be the equivalent of a waiver of sovereign immunity from interest, is "[t]he Secretary [of HHS] may enter into an agreement with the Mayor [of the District] under which the Secretary shall provide funds to the Mayor to complete the repairs and renovations described in [section 225b(f)(2) ](A)." 24 U.S.C. § 225b(f)(2)(C). This is the sole provision in the Transfer Act upon which plaintiff relies for its escalation of costs argument.

This provision cannot be read to compensate the District for the delay in payment of the total amount due at the time of the Hospital's transfer in 1987. This is exactly the type of argument rejected in *Shaw, Chiu* and *Lichtman,* where the plaintiffs attempted to contort statutory terms such as "reasonable" attorney's fees, "cost of living" adjustments and "securing justice" into waivers of sovereign immunity from prejudgment interest. *See Shaw,* 478 U.S. at 320, 106 S.Ct. 2957 ("There is no basis for reading the term 'reasonable' as the embodiment of a specific congressional choice to include interest as a component of attorney's fees, particularly where the legislative history is silent."); *Chiu,* 948 F.2d at 721 (stating that "an adjustment to the attorney fee rate cap to compensate for the plaintiff's economic loss due to delay is not a 'cost of living' adjustment to the fee cap within the meaning of [28 U.S.C. § ] 2412(d)(2)(A)"); *Lichtman,* 835 F.2d at 1428 (finding that a statute discussing the functions of the OPM director so as to secure "justice" did not allow for the payment of interest by OPM for delayed annuity payments because there was no express statutory provision for the payment of interest).

To cite another example of this rule, the term "just compensation" used in a statute does not waive the United States' sovereign immunity from prejudgment interest. *See United States v. Alcea Band of Tillamooks,* 341 U.S. 48, 49, 71 S.Ct. 552, 95 L.Ed. 738 (1951) (stating that the no-interest "rule precludes an award of interest even though a statute should direct an award of 'just compensation' for a particular taking") (citing *United States v. Goltra,* 312 U.S. 203, 61 S.Ct. 487, 85 L.Ed. 776 (1941)). Here, the grant of funds to complete repairs and renovations to Saint Elizabeths cannot be construed to be a waiver of sovereign immunity from interest. This court cannot rewrite the statutory provision "funds ... to complete the repairs and renovations [to the Hospital]," 24 U.S.C. § 225b(f)(2)(C), to read "funds, and interest on those funds if not promptly paid, in sufficient amount to pay for repairs and renovations to the Hospital at inflated costs years later."

It is clear that the cost escalation sought by plaintiff here is an impermissible award of interest. Plaintiff originally sought $12,305,624 in "1986 dollars," allegedly owed to the District for repair costs, but increased that figure to $19,159,856.58 for what plaintiff refers to as an update to these costs

> to the present by using the cost escalation factors developed by the United States Corps of Engineers .... [T]he escalation factor for the period from 1986 through 2002 is 55.70% .... The total repair and renovation costs ... in January 1986 dollars is $12,305,624. With cost escalation through 2002, the total repair and renovation cost is $19,159,856.58.

Pl.'s App. at 902–03, ¶¶ 3–4. The inflationary factor sought by plaintiff is precisely the type of award barred by the no-interest rule unless there has been an express waiver of sovereign immunity. Here in the Transfer Act, there is no such waiver.

When Congress waives sovereign immunity from interest, the waiver is typically found within the statute itself. *Adams v. United States,* 48 Fed.Cl. 602, 604 (2001). On occasion, the waiver might be found in another statute. *Id.* Plaintiff asks the court to examine the legislative history of the Transfer Act

and find indications of congressional intent to waive immunity from prejudgment interest there. *See* Pl.'s Reply at 57 (citing to District requests and HHS appropriation requests that include an escalation line item amount for delays prior to passage of the Act as "demonstrating that it was the intent of Congress to require the payment of an inflation allowance under the Transfer Act"). But the court's inquiry begins and usually ends with a strict and narrow interpretation of the statute itself:

"[T]here can be no consent by implication or by use of ambiguous language. Nor can an intent on the part of the framers of a statute or contract to permit the recovery of interest suffice where the intent is not translated into affirmative statutory or contractual terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed."

*Chiu,* 948 F.2d at 720 (quoting *N.Y. Rayon,* 329 U.S. at 659, 67 S.Ct. 601).

The court may not embark on a search through legislative history for waivers of sovereign immunity from prejudgment interest when a statute is either silent or ambiguous on the topic of such waivers. *See Marathon Oil Co. v. United States,* 374 F.3d 1123, 1127 (Fed.Cir.2004) (stating that "[a] waiver of sovereign immunity 'must be unequivocally expressed,' or a court must infer that Congress did not intend to create a waiver" (citations omitted)). Where, as here, there is no statutory term that can be read to inflate costs, escalate costs, adjust costs or in any other manner provide compensation related to a delay in payment, the no-interest rule applies and the legislative history is irrelevant. *See id.* at 1139 (finding the legislative history of the statute at issue in that case to be "legally irrelevant" because the statute was ambiguous as to any waiver of sovereign immunity from interest). Nevertheless, courts will often discuss legislative history to further demonstrate that the no-interest rule has not been waived by a statute, and this court finds it prudent to follow these examples. *See, e.g., Shaw,* 478 U.S. at 319, 106 S.Ct. 2957 ("The statute, as well as its legislative history, contains no reference to interest."); *Marathon Oil,* 374 F.3d at 1139–40

("Nonetheless, lest there be any lingering doubt that perhaps Congress intended to depart from the historical narrow waiver of immunity for post-judgment interest (as unambiguously reflected in pre-[statute at issue] law), the legislative history of the [statute at issue] makes absolutely certain that Congress intended that the new statutes ... were not to change the narrow waiver of immunity that preceded the [statute at issue].").

The legislative history of the Transfer Act is silent as to whether HHS would be liable for any escalation costs or its equivalent, prejudgment interest. Plaintiff places great weight on HHS documents which tend to show that HHS included a line item for cost escalation due to a delay that would occur subsequent to the January 1986 cost estimates of the AEPA audit, when describing the funds needed for repairs and renovations to Saint Elizabeths pursuant to the Transfer Act. *See* Pl.'s Reply at 56–57; Def.'s App. at 170 (FY 1988 Justification of Appropriation Estimates); *id.* at 196 (Program of Requirements for the Renovation of Buildings to Comply with [the Transfer Act]). These documents, viewed with all favorable inferences due to plaintiff in resisting summary judgment on this issue, merely show that HHS provided Congress with updated versions of the estimates in the AEPA audit, upon which Congress acted. There is no support for plaintiff's suggested inference that in acting on those updated cost estimates, Congress adopted a statutory scheme for continually inflating payments based upon updated cost estimates after the passage of the Transfer Act, in order to provide the District with prejudgment interest or cost escalations. Rather, the only logical conclusion to be reached from a review of the data provided Congress by HHS is that a sum certain was proposed, based on AEPA figures that had been adjusted for as much as three and a half years of inflation, and that Congress appropriated funds in an initial attempt to satisfy the liability of the United States under the Act. The court has found, *supra,* that those initial appropriations may not fully satisfy defendant's liability for the repair and renovations of Saint Elizabeths. However, the court must conclude

that the liability of the United States was fixed by the contemporaneous estimates of renovation costs produced by the statutory scheme which required an audit and review of audit estimates, and that additional liability for cost escalations occurring after the late 1980s was not the intent of Congress and certainly is not reflected in the statutory provisions of the Transfer Act.

For these reasons, the court finds that plaintiff is not entitled to escalation of the repair and renovation costs of Saint Elizabeths to present day costs.

### d. Summary of Liability for Claims in Count IV

■ The court has found that defendant is liable for the full costs of repairs and renovations mandated by the Transfer Act, and that this liability may not have been fully satisfied by initial appropriations in 1987 and was not discharged by accord and satisfaction. On the other hand, the court has found that the District is not entitled to escalation of the repair and renovation costs of Saint Elizabeths to update any award to reflect increases beyond the estimates of those costs that were produced by the contemporaneous review of the AEPA audit at the time of the Hospital's transfer to the District. Having established the liability of the United States, the court now encourages the parties to consider reaching an agreement as to the remaining issue of quantum in Count IV, as an attractive alternative to further litigation to determine whatever damages are owed to the District.

Accordingly, plaintiff's motion for summary judgment for Count IV is granted in part as to the liability of the United States for any unpaid balance on funds due under the Transfer Act for repairs and renovations of Saint Elizabeths. The issue of quantum for Count IV is stayed. Defendant's motion for partial summary judgment for Count IV is granted in part as to escalation costs, and denied in part as to the defense of accord and satisfaction.

### 3. Count V: Costs for the West Campus

In Count V of the complaint, plaintiff seeks recovery of $200,000 for HHS's alleged failure to meet the contractual requirements of the Use Permit. Defendant counters that the Use Permit sets forth conditions that plaintiff has not met, and in any event, that plaintiff's claim was satisfied by payments HHS made in 1988. At issue are costs for the preservation and maintenance of buildings left vacant on the West Campus that were not transferred to the District, but for which the District accepted responsibility during a four-year transition period.

The Use Permit states that:

During the term of this Agreement, the District shall also be responsible for the preservation, maintenance and repair of any buildings on the West Campus not occupied or operated by the District, and shall be reimbursed by the Government up to $1,386,000, for the actual costs thereof. The District shall be reimbursed under this paragraph for the cost of preservation, maintenance and repair of any building initially used or occupied by the District and subsequently vacated only from the date the District provides written notice to the [federal] Government of such vacation.

Def.'s App. at 283, ¶ 13. Plaintiff claims that HHS has paid it approximately $1,186,000 under this clause and that the District is owed the remaining $200,000.

Defendant argues that, on its face, the Use Permit requires HHS to reimburse the District only under certain conditions, those being that: (1) the costs must be associated with "preservation, maintenance and repair" of buildings on the West Campus that are "not occupied or operated by the District"— that is, are vacant; and (2) with respect to buildings that become vacant during the term of the Use Permit, HHS is obligated to reimburse only for costs accruing after notice of vacation is provided to HHS by the District. Defendant asserts that the District may state a claim for $200,000 only if these conditions are met. Defendant argues that the District has not made this showing, challenging the documentation and accounting upon which plaintiff's claim is based. Defendant also makes a satisfaction argument, that $6.1 million for repairs and renovations of Saint

Elizabeths provided to the District must be credited against the alleged $200,000 shortfall in payments required by the Use Permit.

Plaintiff argues that HHS failed to reimburse the District for the costs of preserving, maintaining and repairing the federally-owned buildings on the West Campus that the District did not use between October 1, 1987 and September 30, 1991, as HHS had promised in the Use Permit. Plaintiff claims that the cost of preserving, maintaining and repairing the nine federally-owned buildings on the West Campus was $2,147,760.71. Pl.'s Mot. at 28–29. The Use Permit capped the reimbursable amount at $1,386,000. According to plaintiff, HHS transferred only $1,186,000—$200,000 less than it should have. Plaintiff contends that it provided a complete accounting to defendant, including supporting documentation for the costs of providing maintenance, administrative and utility services to the vacant buildings from 1988 through 1991.

The parties both agree that they entered into a valid agreement allowing for the District's temporary use and occupancy of the West Campus of the Hospital though September 30, 1991, which included a term providing that HHS would reimburse the District for the preservation of vacant buildings up to a certain amount. *See* Pl.'s Facts ¶ 42; Def.'s Facts ¶ 25; Def.'s App. at 280–85. It is important to note that defendant's argument that any shortfall alleged by plaintiff was satisfied by the $6.1 million allegedly transferred for repairs and renovations is not pertinent to the Use Permit dispute. Defendant's alleged $6.1 million payment to the District for repairs and renovations relates to plaintiff's claims in Count IV, claims founded on section 225b of the Act. The $200,000 claim in Count V is a contractual claim for damages under a separate agreement between the parties, the Use Permit. Although there is some overlap in the factual setting underlying these two types of claims, and even though all of these issues arise out of

the transfer of the Hospital to the District, the two obligations of the United States are distinct.

Defendant tries to blur the distinction between these two obligations of the United States. The first obligation was to perform or pay for renovations to Saint Elizabeths, pursuant to 24 U.S.C. § 225b(f)(2)(A), (C), to bring up to code facilities that the District needed for its system implementation plan. The second and separate obligation created by the Use Permit was to pay the District to preserve from further deterioration vacant federal buildings that were not going to be used by the District as part of the system implementation plan. The Use Permit, although referencing the Transfer Act and the AEPA audit to describe the repair responsibilities of the District for occupied buildings, *see* Def.'s App. at 283, ¶ 11, makes no reference to funding that would be provided pursuant to the Act for repairs and renovations. The Use Permit also has no term which can be construed to imply that payment obligations under the Use Permit could be satisfied by the District drawing from allocations made pursuant to the Transfer Act for repairs and renovations.[32] Because the appropriations for repairs and renovations were not applicable to HHS's obligation under the Use Permit, the court finds that the sufficiency of those appropriations for the purposes they were intended, as discussed *supra* in relation to Count IV of the complaint, are inapplicable to plaintiff's claims in Count V.

Both parties concede that HHS has transferred $1,186,000 to plaintiff under the Use Permit. Pl.'s Mot. at 29; Def.'s Mot. at 53. The $1,386,000 figure contained in paragraph 13 of the Use Permit is a ceiling on reimbursements. The paragraph does not state that plaintiff is *entitled* to a total of $1,386,000, but that plaintiff "shall be reimbursed *up to* $1,386,000." Def.'s App. at 283 (emphasis added). Accordingly, unless plaintiff can demonstrate that it performed repairs which cost the full $1,386,000 "for the

---

**32.** Defendant nowhere makes a counterclaim for unauthorized overpayment by HHS for the repairs and renovations of the Hospital, or for misuse of funds by the District. Nor does defendant argue that the doctrine of setoff should apply to Count V. Because defendant has not asserted these counterclaims or this defense, plaintiff has not briefed them, and the court will ignore defendant's comment that "if anything[,] it is plaintiff who owes defendant." Def.'s Mot. at 54.

preservation, maintenance and repair of any buildings on the West Campus not occupied or operated by the District," *id.,* then plaintiff is not entitled to the additional payment of $200,000.

The court finds that there is a genuine issue of material fact as to whether plaintiff is entitled to recover $200,000 under the Use Permit. Although plaintiff has submitted an affidavit and a summary spreadsheet concerning expenditures of $2,147,760.71 for the preservation of the vacant buildings, Pl.'s Facts ¶ 44; Pl.'s App. at 919 n. 8, 944, this evidence is in dispute. Defendant argues that plaintiff has not proved that the costs of repairs made by the District exceeded $1,186,000, Def.'s Reply at 21, and argues that plaintiff's figures do not accurately reflect costs reimbursable under the Use Permit, *id.* at 22. Defendant relies on the Declaration of James E. Pittman of HHS, Def.'s App. at 9–10, which, despite its cursory treatment of this topic, raises questions concerning the accuracy of plaintiff's accounting for its reimbursable building preservation costs.

For this reason, the court grants plaintiff's motion for summary judgment on Count V only in part, on the issue that HHS funds allocated for the repair and renovation of Saint Elizabeths were not available to satisfy the reimbursement liability of the United States for $1,386,000 under the Use Permit. The court denies plaintiff's motion in part, because genuine issues of material fact prevent the granting of summary judgment as to plaintiff's unpaid building maintenance expenses pursuant to the Use Permit. The court denies defendant's motion for partial summary judgment as to Count V. The court strongly suggests that the parties review the accounting data relevant to this disputed claim and achieve a settlement based on the evidence which appears to be readily available but which is not before the court.

### 4. Count VI: Prejudgment Interest

Plaintiff seeks prejudgment interest for the claims in Count VI of the complaint that have been otherwise settled. The court has already addressed the general topic of prejudgment interest in Section II.B.2.c. *supra,* as it applies to the claims in Count IV of the complaint, and incorporates that analysis here. The claim for prejudgment interest for mental health services provided to individuals referred by the Marshals Service turns on whether the term "full costs," 24 U.S.C. § 225g(b)(1), would incorporate a waiver of sovereign immunity of the United States from interest on delayed reimbursement of those services.

"In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award." *Shaw,* 478 U.S. at 314, 106 S.Ct. 2957. The Transfer Act only mandates compensation of the full costs of mental health services and makes no mention of prejudgment interest. The Supreme Court has stated that "only express language in a statute or contract can justify the imposition of such interest." *N.Y. Rayon,* 329 U.S. at 663, 67 S.Ct. 601. Because there is no mention of prejudgment interest in the Transfer Act, plaintiff cannot recover prejudgment interest on Count VI of the complaint.[33]

Accordingly, defendant's motion for partial summary judgment on the issue of the prejudgment interest claimed in Count VI of the complaint is granted.

### CONCLUSION

The court finds that subject matter jurisdiction to entertain this matter exists under 28 U.S.C. § 1491(a)(1), because the Transfer Act is a money-mandating statute for the claims in Counts I, IV, V and VI. Accordingly, it is hereby **ORDERED** as follows:

(1) Plaintiff's Motion for Summary Judgment on Counts I, IV and V, filed December 20, 2002, is **GRANTED in part** with respect to Count I as to plaintiff's claim for patients referred to the District's mental health system under 24 U.S.C. § 225g. Defendant is liable for the reimbursement of the full

---

**33.** Plaintiff did not respond to defendant's arguments against the award of prejudgment interest

for the otherwise settled claims in Count VI.

costs of mental health services for all individuals referred by the Secret Service, 24 U.S.C. § 225g(b)(1)(A), as well as those referrals by the Park Police and Capitol Police to Saint Elizabeths which meet specified qualifying criteria, 24 U.S.C. § 225g(b)(1)(B). Defendant's liability for reimbursement is not limited to the first forty-eight hours of treatment. The mental health services provided by the District shall be reimbursed at rates established by the Medicare rate for the relevant services. The issue of quantum for Count I is **STAYED** until further order of the court, and the parties are encouraged to resolve this issue through settlement. Defendant's Motion to Dismiss or for Partial Summary Judgment on Counts I and IV–VI of Plaintiff's Amended Complaint, filed on June 12, 2003, is **DENIED** as to Count I.

(2) Plaintiff's motion for summary judgment is **GRANTED in part** with respect to Count IV as to plaintiff's claim for costs to repair and renovate the Hospital under 24 U.S.C. § 225b. Defendant is liable for any unpaid balance on funds due under the Transfer Act for repairs and renovations of Saint Elizabeths. 24 U.S.C. § 225b(f)(2)(A), (C). Plaintiff's motion for summary judgment as to Count IV is **DENIED in part** as to escalation costs. The issue of quantum for Count IV is **STAYED** until further order of the court, and the parties are encouraged to resolve this issue through settlement. Defendant's motion for partial summary judgment as regards Count IV is **GRANTED in part** as to escala-

tion costs, and **DENIED in part** as to the defense of accord and satisfaction.

(3) Plaintiff's motion for summary judgment regarding Count V is **GRANTED in part**, on the issue that HHS funds allocated for the repair and renovation of Saint Elizabeths were not available to satisfy the reimbursement liability of the United States of up to $1,386,000 under the Use Permit, and **DENIED in part** as to the United States' liability for $200,000 because the facts underlying this claim are disputed. The court encourages the parties to settle the claim in Count V. The court **DENIES** defendant's motion for partial summary judgment as to Count V.

(4) Defendant's motion for partial summary judgment is **GRANTED** with respect to prejudgment interest on otherwise settled claims of Count VI.

(5) As there is no just reason for delay, pursuant to RCFC 54(b), the Clerk's office is directed to **ENTER** judgment as stated in this opinion.

(6) The parties shall **CONFER** and **FILE** a **Joint Status Report** on or before **November 18, 2005,** proposing how to proceed toward a final resolution of plaintiff's outstanding claims in the subject matter.

(6) Each party shall bear its own costs.